**In the Interest of A.V. and J.V., Minor Children.**

No. 01–0706.

Supreme Court of Texas.

Argued Oct. 9, 2002.

Decided July 3, 2003.

Rehearing Denied Aug. 21, 2003.

James Wiley, Assistant Criminal District Attorney, John W. Segrest, McLennan County Criminal District Attorney, Daniel David Semanek, Office of the Criminal Dist. Atty., Ashley Tallm Westmoreland, Waco, for petitioner.

Nita C. Fanning, Law Office of Nita Fanning, Gerald Ray Villarrial, Waco, for respondent.

Justice ENOCH delivered the opinion of the Court.

Section 161.001(1)(Q) of the Texas Family Code provides that parental rights may be terminated if the parent has knowingly engaged in criminal conduct for which the parent is incarcerated and unable to care for the child "for not less than two years from the date of filing the petition." [1] We must decide whether the two years applies to the period before the filing or after, and whether the subsection is unconstitutional if applied to a parent who was incarcerated before the subsection's effective date. We hold that subsection Q's time period is prospective and that the subsection is constitutional even though applied to a parent incarcerated before the subsection's effec-

---

1. TEX. FAM.CODE. § 161.001(1)(Q).

tive date. Thus, subsection Q is a valid ground for terminating the father's parental rights in this case. Because the father has not preserved any other claims that could be harmful error, we reverse the court of appeals' judgment and render judgment terminating his parental rights.

Pablo Puig is the alleged father of A.V., born in 1986, and J.V., born in 1988. Their mother is Becky Vela. The family lived together in Waco until 1993, when Puig was arrested and convicted for a federal drug offense. He was sentenced to one-hundred months in prison, and the record does not show that he appealed. The children remained with their mother.

After Puig's incarceration, the Texas Department of Protective and Regulatory Services received reports prompting an investigation regarding Vela's care of the children. Caseworker reports show that Vela left the young children at home alone without sufficient food and sent them to school in an unhygienic condition. Acting on this information, the Department began to monitor the children's living conditions. In 1994, Puig learned of the Department's intervention in his children's care and of the allegations concerning Vela's improper care and supervision. At that time, Puig attempted to escape from prison in order, he asserts, to care for his children. His failed escape attempt, along with a conviction for witness tampering in connection with his escape attempt, added forty months to his prison sentence. Thus, his projected release date from prison was June 2003.

In July 1997, the Department filed suit seeking to be named temporary managing conservator of the children. The trial court granted the Department temporary managing conservatorship, and the De-partment placed the children in foster care. The Department drew up separate Family Service Plans for Vela and Puig in August 1997 and initially recommended family reunification. In April 1998, however, the Department amended its petition and requested termination of both Vela's and Puig's parental rights to their children. Vela and Puig had separate trials.

In Puig's case, the Department alleged that Puig's conduct met the elements of section 161.001(1)(Q) and section 161.001(1)(N).[2] At trial at the Department's request, the court submitted two broad-form questions to the jury asking whether Puig's rights to each child should be terminated based on either or both subsections. Neither the Department nor Puig objected to the form of the charge. The jury answered yes to both questions. The trial court signed an order terminating Puig's rights on January 26, 2000. Puig appealed.

In Vela's bench trial, the court concluded that her parental rights should be terminated. And the trial court signed a separate order terminating Vela's rights on March 7, 2000. Vela did not appeal.

Before the court of appeals, Puig argued that the two statutory grounds for terminating his parental rights alleged by the Department were unconstitutionally retroactively applied to him. Further, Puig asserted that the evidence was factually and legally insufficient to support termination based on subsection N. Puig also complained about the trial court submitting the jury charge in broad form and that the judgment violated statutory and constitutional rights.

The court of appeals did not reach any issues regarding the judgment.[3] Regarding subsection Q, the court of appeals

---

2. *See id.* § 161.001(1)(Q), (N).

3. 57 S.W.3d 51, 62.

concluded that subsection Q was unconstitutionally applied to Puig.[4] Though it disagreed with Puig that subsection N was applied retroactively to him, the court determined that the evidence supporting subsection N was legally insufficient.[5] As a result, the court reversed the trial court's judgment, rendered judgment for Puig on the subsection N ground, and remanded the case to the trial court for further proceedings, instructing the trial court to consider its earlier opinion in *In re B.L.D.* concerning the form of the jury charge.[6] We granted the Department's petition for review.

■ The Department first argues that the court of appeals erred in reviewing Puig's unpreserved complaint that the broad form of the charge violated his constitutional and statutory rights to have ten jurors agree to each predicate finding supporting termination. The court of appeals relied on its previous opinion in *In re J.F.C.* to review the unpreserved complaint.[7] Today, in *In re B.L.D.*, we hold that our law on preservation of error does not permit, and due process does not require, a court of appeals to review an unpreserved complaint of charge error in parental-rights termination cases.[8] Because Puig did not object in the trial court to the form of the charge, he waives that complaint on appeal, and our holding in *In re B.L.D.* controls. Therefore, we sustain the Department's first issue.

The Department also questions whether Puig has standing to appeal and whether he forfeited his right to appeal his motion for directed verdict on the constitutional complaints about subsections Q and N. As a result of our disposition, discussed below, we do not reach these questions.

■ We now turn to the questions that decide this case. The Department argues that the court of appeals erred in holding that subsection Q was unconstitutionally applied to Puig. Section 161.001(1)(Q) was amended in 1999 after this suit arose, but non-substantively so. In any event, we set out section 161.001(1)(Q) as written when the Department filed this suit:

> The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
> (1) that the parent has:
>
> . . . .
>
> (Q) knowingly engaged in criminal conduct that results in the parent's imprisonment and inability to care for the child for not less than two years from the date of filing the petition;[9]

The court of appeals interpreted subsection Q's relevant two-year time period "from the date of filing the petition" to mean that the "applicable time period is two years before the petition was filed."[10] The court of appeals noted that subsection Q went into effect on September 1, 1997, and the termination petition was amended in April 1998.[11] Thus, according to the court, the two-year time period extended approximately sixteen months before the

**4.** *Id.* at 60–62.

**5.** *Id.* at 62–63.

**6.** *Id.; see In re B.L.D.,* 56 S.W.3d 203 (Tex. App.-Waco 2001), *rev'd,* 113 S.W.3d 340, 2003 WL 21512622 (Tex.2003).

**7.** 57 S.W.3d at 56–58; *see In re J.F.C.,* 57 S.W.3d 66 (Tex.App.-Waco 2001), *rev'd on other grounds,* 96 S.W.3d 256 (Tex.2002).

**8.** *In re B.L.D.,* 113 S.W.3d at 354–55, 2003 WL 21512622.

**9.** Tex. Fam.Code § 161.001(1)(Q).

**10.** 57 S.W.3d at 60.

**11.** *Id.*

effective date of the statute. Concluding that the application of subsection Q in this case did not meet the exceptions to the general rule that a retroactive law is unconstitutional, the court held that subsection Q as applied to Puig was an unconstitutional retroactive law.[12]

Here, the Department argues that the statute's language mandates a prospective application of the two-year time period rather than the retrospective reading that the court of appeals adopted. Our courts of appeals, however, have differed in their reading of subsection Q—some advocate a retrospective application while others adopt a prospective application. For example, the courts in *In re A.L.S.*[13] and *In re A.R.R.*[14] held that subsection Q should be read retrospectively to refer to the two years before the Department's petition is filed. But in *In re R.F.*,[15] *In re B.M.R.*,[16] *In re D.R.L.M.*,[17] and *In re I.V.*,[18] the courts interpreted subsection Q to be read prospectively to refer to the two years after the Department's petition is filed. Commentators recognize that our courts of appeals have struggled with the interpretation of subsection Q:

> The ground is somewhat ambiguous because it is unclear whether it is the sentence of "not less than two years" or

whether the individual must actually be incarcerated for that length of time. For example, if an individual is sentenced to life imprisonment, may termination proceed immediately or must there be a two year delay before the ground is fully met and the termination may proceed?[19]

Practitioners, too, have grappled with the repercussions of interpreting subsection Q prospectively or retrospectively:

> If applied to recent convictions requiring prospective confinement, opposing counsel is sure to raise issues such as the possibility of reversal on appeal, or the possibility of early parole. If applied only to sentences *already served*, courts may have to render a final order [regarding the termination of parental rights] under the new 12–month time frame before the two year period of imprisonment has passed.[20]

But to us, the phrase "two years from the date of filing the petition" reasonably indicates, consistent with the common usage of the word "from," a prospective reading. Webster's Dictionary defines "from" as "to indicate a starting point."[21] We must read words and phrases in context and

12. *Id.* at 61.

13. 74 S.W.3d 173, 183 (Tex.App.-El Paso 2002, no pet.), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 & n. 39.

14. 61 S.W.3d 691, 700 (Tex.App.-Fort Worth 2001, pet. denied), *disapproved of on other grounds by In re C.H.*, 89 S.W.3d 17 (Tex. 2002).

15. 89 S.W.3d 258, 260 (Tex.App.-Corpus Christi 2002, no pet.).

16. 84 S.W.3d 814, 817–18 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

17. 84 S.W.3d 281, 295 (Tex.App.-Fort Worth 2002, pet. denied).

18. 61 S.W.3d 789, 798 (Tex.App.-Corpus Christi 2001, no pet.), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 & n. 39.

19. JOHN J. SAMPSON ET AL., SAMPSON & TINDALL'S TEXAS FAMILY CODE ANNOTATED, § 161.001 cmt. (12th ed.2002).

20. Phoebe Knauer et al., *Grounds for Termination of Parental Rights*, 2000–4 STATE BAR SECTION REPORT FAMILY LAW 17 (2000).

21. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 913 (3d ed.1961).

construe them "according to the rules of grammar and common usage."[22]

This prospective reading is supported by what words the Legislature used in other subsections of section 161.001(1) that specify time periods that must elapse before the Department may assert the particular subsection against the parent. For example, section 161.001(1)(B) specifies that a ground for termination exists when the parent has "voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months...."[23] Section 161.001(1)(C) provides a termination ground when the parent has "voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months...."[24]

In these instances, the Legislature was clear about the retrospective nature of each time period. But in subsection Q, the Legislature does not express that the two-year imprisonment must have occurred before the filing date. Nor is there any indication that the Legislature meant anything other than what it said. The bill analysis discussing the addition of subsection Q states only that the purpose behind adding that subsection was to "expand[ ] the reasons why a court may order termination."[25] We accordingly disagree with the court of appeals' holding that subsection Q should be read retrospectively. It is to be read prospectively. We also disapprove of the courts of appeals' decisions that applied subsection Q retrospectively— *In re A.L.S.*[26] and *In re A.R.R.*[27]

■ In reading subsection Q to apply prospectively, the subsection fills a gap left by other grounds for termination. A prospective reading of subsection Q allows the State to act in anticipation of a parent's abandonment of the child and not just in response to it. Thus, if the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time, the State may use subsection Q to ensure that the child will not be neglected.

■ Concluding that subsection Q is to be read prospectively does not end our discussion. Puig asserts that subsection Q was still unconstitutionally retroactively applied to him. He argues that because subsection Q was enacted in 1997, his pre 1997 criminal conviction and imprisonment cannot be used to satisfy the subsection's elements. Though he raised this point in the court of appeals, it is not clear that the court addressed this issue. Regardless, Puig is reading the subsection as if it constituted an additional punishment for his criminal conduct. This is not, however, the case.

■ First, subsection Q focuses on the parent's future imprisonment and inability to care for the child, not the criminal conduct that the parent committed in the past. By looking at future imprisonment and inability to care for the child, subsection Q purports to protect children whose parents will be incarcerated for periods exceeding two years after termination proceedings

---

22. Tex. Gov't Code § 311.011(a).

23. Tex. Fam.Code § 161.001(1)(B).

24. *Id.* § 161.001(1)(C); *see also* § 161.001(1)(F), (J)(ii), (N), (O).

25. House Comm. on Juvenile Justice & Family Issues, Bill Analysis, Tex. H.B. 1826, 75th Leg., R.S. (1997).

26. 74 S.W.3d at 183.

27. 61 S.W.3d at 700.

begin. Indeed, the purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. Although the "termination suit can result in a parent's loss of his or her legal relationship with the child," the primary focus is protecting the best interests of the child.[28]

In addition, this aim is reflected in the State's duty to protect the safety and welfare of its children, a policy underlying the State's role in intervening, when necessary, in the parent-child relationship: "The public policy of this state is to: ... provide a safe, stable, and nonviolent environment for the child...." [29] This "valid exercise of the police power by the Legislature to safeguard the public safety and welfare" is a recognized exception to the unconstitutionality of retroactive laws.[30] To be clear, we do not agree with the court of appeals when it says that an enactment of the Legislature is "not necessary to safeguard the public safety and welfare" because the Legislature was not urgent in enacting the provision.[31]

■ Further, in securing what is in the best interests of the child, the State is not pursuing a retributive or punitive aim, but a "purely remedial function: the protection of minors." [32] We recognize that parental-rights termination proceedings also affect a parent's constitutionally-protected relationship with his or her children, a right that presumably cannot be altered through retroactive application of law.[33] But this Court has stated that "the rights of natural parents are not absolute; protection of the child is paramount.... The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." [34] Therefore in parental-rights termination proceedings, though parents face losing this highly-protected legal relationship, courts cannot ignore the statute's remedial purpose of protecting abused and neglected children.

■ As well, there is a second recognized exception to the unconstitutionality of retroactive laws. A law that does not upset a person's settled expectations in reasonable reliance upon the law is not unconstitutionally retroactive.[35] After his convictions for dealing drugs and the attempted prison escape, and the imposition of a one-hundred-and-forty month sentence, Puig could not reasonably expect that the State would not act to provide a safe environment for his children while he was imprisoned. Indeed, as our Court of Criminal of Appeals has determined, "[t]he resolution of criminal charges will always carry the possibility of collateral consequences, and as long as those consequences are not statutorily restricted, disabilities and disqualifications which the defendant might not have anticipated may proceed from the prior cause." [36] We note

**28.** *Ex parte Cantu,* 913 S.W.2d 701, 705 (Tex. App.-San Antonio 1995, writ ref'd) (quoting *Malone v. State,* 864 S.W.2d 156, 159 (Tex. App.-Fort Worth 1993, no writ)).

**29.** TEX. FAM.CODE § 153.001(a)(2).

**30.** *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 633–34 (Tex.1996).

**31.** 57 S.W.3d at 60.

**32.** *Ex parte Cantu,* 913 S.W.2d at 706.

**33.** *See Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976).

**34.** *In re J.W.T.,* 872 S.W.2d 189, 195 (Tex. 1994) (citation omitted).

**35.** *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 269–70, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

**36.** *Scott v. State,* 55 S.W.3d 593, 597 (Tex. Crim.App.2001); *Ex parte Kubas,* 83 S.W.3d 366, 370 (Tex.App.-Corpus Christi 2002, pet. ref'd).

that our reasoning is consistent with the United States Supreme Court's recent decision in *Smith v. Doe*,[37] a case that involved a challenge to the Alaska Sex Offender Registration Act. In *Smith*, the Court held that requiring offenders who were convicted before the passage of the Act to comply with its provisions did not violate the prohibition against retroactive application of law because the Act is nonpunitive in intent and effect.[38]

Considering that subsection Q aims to remedy the conditions of abused and neglected children, not to enhance the punishment of the parent, and that subsection Q does not disappoint any reasonable reliance Puig could have placed on the law when he was convicted of the federal offenses, we hold that subsection Q was not unconstitutionally retroactively applied to Puig. Puig did not challenge in the court of appeals the factual or legal sufficiency of the evidence supporting subsection Q. Accordingly, subsection Q is a valid ground for termination.

Because we determine that subsection Q was not retroactively applied and because Puig does not challenge the sufficiency of the evidence supporting subsection Q or the finding that termination was in his children's best interest, we need not reach any other issues raised by Puig. Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.[39]

Puig did not argue to the trial court that because the charge was based on a theory without evidentiary support, the charge should not be submitted in broad form. To preserve this complaint, a party must make "[a] timely objection, plainly informing the court that a specific element ... should not be included in a broad-form question because there is no evidence to support its submission...."[40] The only specific objections Puig made to the charge were to request an instruction or definition on constructive abandonment and to argue the constitutionality of the statutes. In his objection to the latter point, Puig's counsel stated:

> Your Honor, first and foremost, let me object. Again based on Article 1, Section 16 of the Texas Constitution, we would object to the constructively abandon ground, which is the A ground, and also the B ground, knowingly engaged in criminal conduct which results in the parent's imprisonment, both of those as being retroapplications of the statute with respect to my client, therefore being unconstitutional. I would adopt the full argument that I did in the directed verdict in conjunction with this, but I want to make sure that I launch the objection under Article 1, Section 16 of the Texas Constitution, that both of

37. —— U.S. ——, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003).

38. *Id.* at 1154.

39. *See* TEX. FAM.CODE § 161.001; *In re U.P.*, 105 S.W.3d 222, 229 (Tex.App.-Houston [14th Dist] 2003, pet. filed); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex.App.-Amarillo 2003, no pet h.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex.App.-Texarkana 2003, no pet. h.); *Robinson v. Texas Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 687 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *In re D.M.*, 58 S.W.3d 801, 813 (Tex.App.-Fort Worth, 2001, no pet.); *In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.); *In re R.D.*, 955 S.W.2d 364, 367 (Tex.App.-San Antonio, 1997, writ denied); *Flowers v. Texas Dep't of Human Res.*, 629 S.W.2d 891, 893 (Tex.App.-Fort Worth 1982, no writ).

40. *Harris County v. Smith*, 96 S.W.3d 230, 231 (Tex.2002); *see Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex.2000).

these statutes are, in fact, a retroapplication to my client.

The court overruled the objections. The record is clear—and Puig does not dispute—that he never objected to the question being submitted to the jury in broad form. In *Harris County v. Smith* and *Crown Life v. Casteel,* we emphasized the importance of a specific objection to the charge to put a trial court on notice to submit a granulated question to the jury.[41] Because Puig did not make a specific and timely objection to the broad-form charge, he did not preserve a claim of harmful charge error.

Thus, any complaint regarding harmful charge error based on broad-form submission was not preserved for review by the court of appeals, or by us. And because any complaint about the trial court submitting a broad-form question to the jury was waived, we look only to see if one of the grounds submitted to the jury is a valid ground upon which termination of parental rights could be based.[42] Having determined that subsection Q was a valid ground upon which the trial court's judgment terminating Puig's parental rights could be based, we need not address whether subsection N is supported by factually or legally sufficient evidence for termination. Consequently, we conclude that the court of appeals erred in reversing the trial court's judgment. And accordingly, we reverse the court of appeals' judgment and render judgment terminating Puig's parental rights.

**41.** *Harris County,* 96 S.W.3d at 236; *Casteel,* 22 S.W.3d at 389.

