

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-12-00418-CV

IN THE INTEREST OF E.A., JR., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant E.A. Sr. appeals from the trial court's termination of his parental

relationship with his son, E.A. Jr.  In three issues, Appellant challenges the trial

court's findings of nonpaternity and the factual sufficiency of the evidence to

support the trial court's best interest finding.[2]  Appellant has not challenged the

trial court's endangerment findings or the finding regarding his imprisonment and

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Fam. Code Ann. § 161.001(2) (West Supp. 2012).

inability to care for E.A. Jr.[3]  Because we hold that the evidence is insufficient to support the trial court's finding that Appellant did not file an admission of paternity with the trial court but that the evidence is sufficient to support the best interest finding and therefore termination, we affirm the trial court's judgment as modified.

In his first two issues, Appellant challenges the trial court's nonpaternity findings.  Specifically, in his first issue, he challenges the factual sufficiency of the evidence to support the trial court's finding that he did not file an admission of paternity.[4]  That finding, number 9.1., reads,

> The Court finds by clear and convincing evidence that, after having waived service of process or being served with citation in this suit, (Appellant) did not respond by filing an admission of paternity or by filing a counterclaim of paternity or for voluntary paternity to be adjudicated under Chapter 160 of the Texas Family Code before the final hearing in this suit.

The State concedes that Appellant's admission of paternity after being served with citation defeats this finding.  We agree.[5]  Accordingly, we sustain Appellant's first issue in part, and we modify the trial court's judgment to delete finding number 9.1.

Appellant, however, does not challenge the trial court's findings that he knowingly placed or knowingly allowed E.A. Jr. to remain in conditions or

---

[3] *See id.* § 161.001(1)(D)–(E), (Q).

[4] *See id.* § 161.002(b)(1) (West 2008).

[5] *See id.*; *In re K.E.S.*, No. 02-11-00420-CV, 2012 WL 4121127, at *3 (Tex. App.—Fort Worth Sept. 20, 2012, pet. denied) (mem. op. on reh'g).

2

surroundings that endangered his physical or emotional well-being; engaged in conduct or knowingly placed E.A. Jr. with persons who engaged in conduct that endangered his physical or emotional well-being; and knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and inability to care for E.A. Jr. for not less than two years from the original filing date of the petition.[6]  Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination.[7]  We therefore do not reach the remainder of Appellant's first two issues.[8]

In his third issue, Appellant contends that the evidence is factually insufficient to support the best interest finding.  In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own.[9]  We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the

---

[6]*See* Tex. Fam. Code Ann. § 161.001(1)(D)–(E), (Q).

[7]*In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[8]*See* Tex. R. App. P. 47.1; *A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.).

[9]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

3

child.[10]  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[11]

There is a strong presumption that keeping a child with a parent is in the child's best interest.[12]  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.[13]

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

    (E)    the programs available to assist these individuals to promote the best interest of the child;

    (F)    the plans for the child by these individuals or by the agency seeking custody;

---

[10]Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[11]*H.R.M.*, 209 S.W.3d at 108.

[12]*In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[13]Tex. Fam. Code Ann. § 263.307(a) (West 2008).

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.[14]

These factors are not exhaustive, and some listed factors may be inapplicable to some cases.[15]   Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.[16]   On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[17]

The evidence shows that E.A. Jr. needs, and will likely continue to need, a great deal of care.  Born prematurely in May 2010, he stayed in the hospital until July 2010, when he was removed from his parents.  On the advice of hospital staff, he was placed in a medical-needs home by the Texas Department of Family and Protective Services (TDFPS) because of the various conditions he suffered from birth.  He was still in that home at trial.  He had been diagnosed with cerebral palsy just weeks before trial.  He was also developmentally delayed.  By trial, when he was seventeen months old, he was still not babbling

---

[14]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

[15]*C.H.*, 89 S.W.3d at 27.

[16]*Id.*

[17]*Id.*

or saying any words. Instead, he would scream. He also had issues with his body tone, walking only recently before trial but not "flat on his feet," and he had received Botox injections around his ankles to increase flexibility. When questioned about the type of home he needs, the caseworker testified,

> He would need somebody who would be willing to be patient with him, because he does get really impatient when you're trying to feed him. He's very demanding and he's actually really heavy. He's heavier than probably a child that didn't have high tone. He would just need somebody who . . . would be patient with him and would have the ability to go to several medical appointments with him, because he does have to go to a pulmonologist, and there is a cyst in the airway that has to be monitored, although they came back, they actually popped it once, and it came back and they burned it. We don't know if it's going to come back, so there is going to be continued, ongoing continued medical appointments.

> He gets sickly very fast, and so somebody definitely has to know what they're doing with him.

The evidence also shows that Appellant has a history of committing domestic violence. Although he denied being physically abusive to J.H., E.A. Jr.'s mother, he admitted being "verbally" and mentally abusive to her. In February 2010, while pregnant with E.A. Jr., J.H. told Child Protective Services (CPS) that Appellant had threatened her life and the life of her daughters. In mid-April 2010, J.H. reported to CPS that she had been hospitalized after being attacked by Appellant. On May 2, 2010, approximately two weeks before E.A. Jr.'s premature birth, Appellant refused to leave J.H.'s hospital room despite her request and despite the fact that she was crying and upset after an argument with him. Appellant had to be escorted out of the hospital by security.

6

Evidence also shows that Appellant threatened violence to CPS employees. When CPS informed Appellant that E.A. Jr. was being removed, Appellant became agitated and had to be escorted from the hospital by security. He allegedly threatened five CPS workers, including threatening to "bust a cap" in the investigator, which she took as a threat that he would shoot her.

Though he was only twenty-two years old at trial, the evidence shows that Appellant had already been incarcerated several times and was incarcerated at the time of trial. He admitted at trial that he was not able to parent when he was incarcerated. He also admitted that by 2010, he had been incarcerated for seven different offenses as an adult, the first two occurring when he was seventeen years of age and at school. At the age of eighteen, he was arrested for burglary of a habitation. The judge in the criminal case placed him on community supervision. Appellant admitted to repeatedly violating the terms of his community supervision by using marijuana in 2010. He also specifically admitted that he used marijuana in March and April 2010, when he knew E.A. Jr.'s mother was pregnant with him, as well as in June, July, August, and October 2010, after E.A. Jr. was born in May 2010. Appellant admitted that he was making a horrible parenting decision every time he used during the pregnancy. He further admitted that he knew he was risking his parental rights when he smoked marijuana after this case was filed in the trial court. He also admitted that he knew that every time he smoked marijuana, he violated the terms of his community supervision and therefore risked going to prison. Appellant conceded that every time he

broke the law and violated the terms of his community supervision, he endangered E.A. Jr. by risking imprisonment. Despite his repeated usage of marijuana, he denied being an addict.

While Appellant put on evidence to support his theory that prison had matured him, TDFPS's evidence shows that Appellant continued to violate rules in prison and continued to duck responsibility for his own conduct. Appellant admitted that he had been accused of violating rules in prison. His alleged violations included disobeying an order, using indecent and violent language, and violating a written posted rule, as well as more serious alleged violations such as fighting without a weapon but with serious injury, a major violation that he testified blocked his initial parole attempt.

The evidence also shows that Appellant had mental health issues. When CPS opened the case on J.H. and Appellant regarding J.H.'s two daughters, J.H., then pregnant with E.A. Jr., told the CPS investigator that she and Appellant both had bipolar disorder but that they were not taking medicine for the condition. Appellant told a CPS investigator at the hospital that "[she'd] better watch what [she said] to him because he's bipolar." He told her that because of his condition, "[h]e gets mad." He also told her that he was working with MHMR to treat the condition. The record shows that Appellant was in fact placed on the MHMR caseload in 2008, but he admitted at trial that MHMR dropped him as a patient in July 2009, long before he met the CPS investigator, because of several missed scheduled appointments.

8

Appellant confirmed at trial that he has been diagnosed with a bipolar disorder, and some of his mental health records admitted at trial indicate that he also suffered from depression and schizoaffective disorder. Though he had reported hearing the voices of demons in June 2008, a time when he had rated his depression at 8 on a scale of 1–10 with 10 being the worst, he denied at trial that he had ever heard voices. Appellant testified that he was receiving no medication or treatment for mental illness in prison and that the assessing physician who evaluated him upon his transfer to prison claimed to see no signs of bipolar disorder.

Appellant testified that he should be released from prison in 2013 and that he had lined up a job and a place to live with an uncle. Appellant's plans did not include E.A. Jr. directly because Appellant believed that E.A. Jr. would be living with Appellant's mother, Ms. A. But Appellant did want an opportunity to parent his son.

Appellant did not see E.A. Jr. after TDFPS removed the child in July 2010. By the time the trial court ordered that the visitations take place at Family Court Services (made necessary by Appellant's threats against CPS), Appellant was incarcerated.

Although Appellant wanted his mother to have custody of E.A. Jr., and she likewise wanted to care for her grandson, TDFPS's evidence indicates that she was not physically able to care for such a young toddler with his own complex needs. The caseworker reported that Ms. A.

had a hard time, first of all, getting up from the couch. She carried the child immediately[,] standing up for maybe 10 seconds[,] and then she asked if she could sit down. During the entire visit, she had a hard time just picking him up. He's very heavy. She only carried him like once or twice in that visit that we were there.

Evidence also reveals that she had knee pain for which she had been prescribed hydrocodone three times a day. Ms. A. had asked her doctor not to renew the prescription anymore because she understood that the prescription for pain medicine, not the pain itself, concerned TDFPS.

In addition to her physical limitations, the evidence further shows that Ms. A. was less than forthcoming in discussions with CPS during the home study about having a fiancé as well as having someone else living in her house who had CPS history.

Even though the foster parents with whom E.A. Jr. resides do not wish to pursue adoption, TDFPS is actively pursuing an adoptive home for the child. The agency had received at least ten inquiries about the boy after putting out a broadcast that described him and his conditions. At that time, the cerebral palsy label was not yet attached to his conditions. TDFPS also indicated that in the future, it is willing to consider any other relative who expresses an interest in raising E.A. Jr. as a potential placement as long as the child is not already in an adoptive placement.

After reviewing the entire record and giving appropriate deference to the trial court's findings, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between

10

Appellant and E.A. Jr. would be in the child's best interest.[18]  Accordingly, we overrule Appellant's third issue.

Having sustained Appellant's first issue in part, we modify the trial court's judgment to delete finding number 9.1.  Having overruled his remaining dispositive issues, we affirm the trial court's judgment as modified.


LEE ANN DAUPHINOT<br>
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED:  March 28, 2013

---

[18]*See* Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28.