Opinion issued November 26, 2014



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00442-CV

———————————

## IN THE INTEREST OF J.R.W., a Child

---

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2013-02967J

---

## MEMORANDUM OPINION

T.M.'s parental rights to her son, J.R.W., were terminated. In three issues, she contends the evidence to be legally and factually insufficient to support the trial court's findings that she committed a predicate act required for termination and that termination was in her son's best interests. We affirm.

## Background

T.M. tested positive for benzodiazepines, opiates, and marijuana when she gave birth to J.R.W. on May 5, 2013. The next day, the Department of Family and Protective Services received a referral of neglectful supervision of J.R.W. Following its investigation, the Department filed its original petition for conservatorship and termination of parental rights, accompanied by a supporting affidavit of Bianca Almaguer, a Department caseworker.

Almaguer attested that when she and T.M. met on May 7, 2013, T.M. denied any drug use and theorized that because her boyfriend (J.R.W.'s putative father, B.W.) used drugs and "smokes a lot," the marijuana might have transmitted to her when they had sex. T.M. further claimed to have taken no pills since learning she was pregnant, and ascribed her positive results for benzodiazepines and opiates to the pain medication her doctor prescribed. Her medical personnel, however, denied prescribing anything that would test positive for benzodiazepines or opiates.

T.M initially said that she lived with B.W. and his mother, but later told Almaguer that she lived with her grandmother. B.W.'s mother clarified that T.M. stayed with her for only a few nights at the end of her pregnancy but was not welcome to return. Caseworker Almaguer's affidavit further noted that the Department's attempts to reach B.W., both by phone and in person, were

2

unavailing.[1] J.R.W. was placed into foster care by the Department on May 10, 2013, and a full adversary hearing was held in the trial court eleven days later at which T.M. testified that J.R.W.'s removal was due to her having tested positive for marijuana, benzodiazepines, and opiates when he was born. She further testified that the last time she had smoked marijuana was May 5, 2013—the day J.R.W. was born. The trial court subsequently signed an order appointing the Department temporary managing conservator of J.R.W.

Following the hearing, the Department created a family service plan for T.M. that included parenting classes, individual and couple's therapy, drug/alcohol assessment, a psychosocial evaluation, and requirements for stable housing and financial responsibility. Of particular note was the plan's requirement to "participate in drug/alcohol testing" and to "show progress by testing negative for drugs or alcohol." The plan also identified family reunification as a "goal."

At a July 11, 2013, status hearing the trial court approved the plan, noting that T.M. had reviewed and understood the plan and had been advised that her parental rights could be subject to restriction or termination unless she was willing and able to provide J.R.W. with a safe environment, with the assistance of the Department and within the period of time specified in the plan.

---

[1] Although DNA testing subsequently excluded B.W. as J.R.W.'s biological father, T.M refused to provide information as to the identity of J.R.W.'s father.

3

T.M. completed a parenting program, individual therapy courses, and outpatient substance abuse treatment, signed a six-month lease, obtained employment, and participated in weekly family visits with J.R.W. She also tested negative on drug tests performed in May, July, and October 2013.

At a hearing the following February, the trial court, noting T.M.'s compliance with the plan's requirements thus far, signed an order that recited it would "approve a transitional placement of the child in the mother's home contingent upon attorney ad litem's approval."

That same day, T.M. submitted to the final court-ordered urinalysis and hair follicle test and although the urinalysis results were negative, the hair follicle sample tested positive for both cocaine and marijuana.

Trial commenced May 8, 2014. Department caseworker Michelle Copeland testified that T.M. had been cooperative, completed parenting classes, individual therapy, outpatient substance abuse treatment, appeared for visits with J.R.W., and tested negative on all drug tests until February 2014 but that her February drug test results precluded her full compliance with the plan. Copeland further testified that T.M. had admitted drug use during a family group conference and, although she "went back and forth" on whether she had used marijuana, admitted that she had tested positive for it. Copeland believed that termination of T.M.'s parental rights was in J.R.W.'s best interests because, as a one year old, the child was unable to

4

protect himself; T.M. had no meaningful support system, and although having completed out-patient services and been taught coping skills, T.M. had not used them. Copeland further testified that J.R.W.'s current placement was meeting all of his basic physical and emotional needs and the foster parents wished to adopt him.

On cross-examination, Copeland testified that with the exception of testing positive for cocaine in February 2014 (and noting that cocaine was a stronger drug than marijuana), T.M. had done everything the family service plan required and that, but for the positive drug test, the Department would not be seeking termination of T.M.'s parental rights.

Bruce Jeffries, the owner of the company that conducted the February drug tests, testified that T.M. tested negative on the urinalysis test but the hair follicle test was positive for ingestion of cocaine and exposure to marijuana. These results indicated that T.M. "never did use marijuana. She's been around it and she used cocaine more than one time." On cross-examination, Jeffries acknowledged that the results showed that the amount of cocaine detected was a "trace," but for cocaine "to get trapped in the hair, you have to do it consecutive days, at least twice in a row." Jeffries also testified that after the February test, T.M. paid for a hair follicle test to be performed on March 12, 2014, the results of which were negative.

T.M. testified that she tested positive for marijuana when J.R.W. was born and that, at the March 21, 2013 hearing, she admitted that she had last used marijuana on May 5, 2013, the day her son was born.[2] However, when asked about the February 6th test, T.M. denied ever using cocaine. She testified that she was shocked at the positive test results and requested that she be re-tested; when the request was denied, she paid to have another test done on March 12, 2014, the results of which were negative. T.M. further testified that she had maintained steady employment throughout the case, leased an apartment, and had completed her family service plan. T.M. stated that she has not abused or neglected J.R.W. and that he was not born addicted to drugs. According to T.M., her visits with J.R.W. went very well, he smiled when he saw her and had bonded with her, and he cried when she had to leave.

Vanessa Finzetto with Child Advocates, Inc. testified that T.M. had been doing great until the positive drug test, and that she was concerned because, although T.M. had done well, she "collapsed at the end." In her report to the court, Finzetto stated that "[T.M.'s] ability to refrain from using substances is critical in determining her ability to properly care for her child." She further testified that she was also concerned because there was a gap in sample drug tests for T.M. from

---

[2] On cross-examination, she testified that J.R.W. was delivered six days early and that she had actually smoked marijuana shortly before J.R.W. was born.

November to December 2013. In Finzetto's opinion, termination of T.M.'s parental rights was in J.R.W.'s best interests.

At the conclusion of the hearing, the trial court terminated T.M.'s parental rights under Family Code section 161.001(1)(E) and (O), and it appointed the Department as the sole managing conservator of J.R.W. The court signed the final decree of termination on May 27, 2014. T.M. timely filed this appeal.

## Discussion

In three issues, T.M. challenges the legal and factual sufficiency of the evidence supporting the judgment terminating her parental rights to J.R.W. under Family Code section 161.001(1)(E) and (O), and the finding that termination of her parental rights are in the best interests of the child.

### A. Applicable Law

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685

7

S.W.2d 18, 20 (Tex. 1985). Nonetheless, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d at 361. Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

In a case to terminate parental rights under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362. Here, the trial court based the termination of T.M.'s parental rights on the predicate grounds of endangerment, *see* TEX. FAM. CODE ANN. § 161.001(1)(E), and failure to comply with a court order, *see id.* § 161.001(1)(O).

## B. Standard of Review

In a legal sufficiency review in a parental rights termination case, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If, after conducting a legal sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.*

In conducting a factual sufficiency review, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm conviction or belief about the truth of the matter on which the Department bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## C. Analysis

### 1. Failure to Comply with a Court Order (§ 161.001(1)(O))

T.M.'s second issue contends the evidence to be legally and factually insufficient to support the trial court's decree under subsection (O), which provides for termination of the parent–child relationship if the trial court finds by clear and convincing evidence that the parent has:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(O). Thus, under subsection (O), the Department must prove that (1) it has been the child's temporary or permanent managing conservator for at least nine months; (2) it took custody of the child as a result of a removal from the parent for abuse or neglect; (3) a court issued an order establishing the actions necessary for the parent to obtain the return of the child; and (4) the parent did not comply with the court order. Here, T.M. argues that there was no evidence showing that J.R.W. was removed for abuse or neglect, and

thus, there was no need to create a series of actions for her to complete in order to return him to her care.

We interpret the words "abuse" and "neglect" broadly to necessarily include the risks or threats of the environment in which the child is placed. *See In re E.C.R.*, 402 S.W.3d 239, 246, 248 (Tex. 2013). In *E.C.R.*, the supreme court considered whether the evidence was sufficient to support the trial court's finding that the children involved had been removed because of abuse or neglect. *Id.* at 246. In particular, the court considered an affidavit that the Department had filed in support of its petition, in which the affiant noted allegations that the child's sibling had been physically abused. *Id.* at 248. The supreme court noted that, "[t]his affidavit, even if not evidence for all purposes, shows what the trial court relied on in determining whether removal was justified." *Id.* The trial court subsequently found "sufficient evidence to satisfy a person of ordinary prudence and caution that [the child] faced an immediate danger to his physical health or safety, that the urgent need to protect him required his immediate removal, and that he faced a substantial risk of a continuing danger if he were returned home [.]" *Id.* The supreme court then held that the affidavit and subsequent finding by the trial court authorizing the child's removal were sufficient evidence to establish, as a

11

matter of law, that the child had been removed under chapter 262 for abuse or neglect.[3] *Id.* at 249.

Here, the Department's original petition for conservatorship and termination of parental rights, filed on May 13, 2013, was accompanied by Almaguer's supporting affidavit that T.M. tested positive for marijuana, benzodiazepines, and opiates when J.R.W. was born; T.M.'s denial of smoking marijuana and her theory of "transmittal" during sex with her pot-smoking boyfriend; and T.M's denial of taking pills and her attribution of the positive test result for benzodiazepines and opiates to prescribed pain medication—despite medical personnel's disavowal of

---

[3] The *E.C.R.* court also cited several similar cases in which documentary evidence supporting DFPS's petition and the trial court's subsequent temporary order for removal of the child were held to be sufficient evidence to establish that the child had been removed for abuse or neglect. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *see, e.g.*, *In re J.S.G.*, No. 14–08–00754–CV, 2009 WL 1311986, at *6–7 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.) (relying on caseworker's affidavit in support of Department's removal request, as well as trial court's temporary orders concluding that children faced danger to their physical health or safety and substantial risk of continuing danger if returned home, to conclude that evidence established that children were removed "as a result of neglect specific to them by" mother); *see also D.F. v. Tex. Dep't of Family & Protective Servs.*, 393 S.W.3d 821, 830–31 (Tex. App.—El Paso 2012, no pet.) (noting that trial court's finding of immediate danger to child's physical health or safety or that children were neglected or abused supported finding of neglect); *In re S.N.*, 287 S.W.3d 183, 190 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that affidavit, family service plan, and temporary orders showing danger to physical health or safety and substantial risk of continuing danger supported finding that children were removed under Chapter 262 for neglect); *In re AAA.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (considering affidavit in support of removal and trial court's temporary orders finding continuing danger to physical health or safety of child if returned to parent as evidence that child was removed because of neglect).

having provided T.M. any medication that would have caused her to test positive for those substances.

At the full adversary hearing on May 21, 2013, T.M. testified that the last time she had smoked marijuana was on May 5, 2013—the day J.R.W. was born, and that B.W. told her at the hospital that he would stop smoking marijuana but that she did not know whether he had, in fact, stopped. The trial court subsequently signed an order appointing the Department temporary managing conservator of J.R.W. and found as follows:

> The Court finds there is sufficient evidence to satisfy a person of ordinary prudence and caution that: (1) there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child; (2) the urgent need for protection required the immediate removal of the child and makes efforts to eliminate or prevent the child's removal impossible or unreasonable; and (3) notwithstanding reasonable efforts to eliminate the need for the child's removal and enable the child to return home, there is a substantial risk of a continuing danger if the child is returned home.

> The Court finds sufficient evidence to satisfy a person of ordinary prudence and caution that there is a continuing danger to the physical health or safety of the child and for the child to remain in the home is contrary to the welfare of the child.

The affidavit in support of the Department's petition, T.M.'s testimony at the May 21, 2013 hearing, and the trial court's subsequent temporary order authorizing removal of the child is the type of evidence upon which the supreme

13

court relied in *E.C.R.* in concluding that the evidence was sufficient to support the trial court's finding that the child had been removed for abuse or neglect. *See In re R.M.S.*, No. 01-13-00331-CV, 2013 WL 5637703, at \*3–4 (Tex. App.—Houston [1st Dist.] Oct. 11, 2013, no pet.) (concluding caseworker's affidavit and trial court's subsequent temporary order removing child from mother's home was type of evidence upon which *E.C.R.* court relied in finding evidence sufficient to support trial court's finding that child had been removed for abuse or neglect). As the court in *E.C.R.* clarified, "'abuse or neglect' of the child necessarily includes the risks or threats of the environment in which the child is placed." *In re E.C.R.*, 402 S.W.3d at 248. Here, the evidence showed that T.M. had used drugs while pregnant with J.R.W. and maintained a relationship with a man who used drugs and was on probation for possession of a controlled substance. Further, T.M.'s positive drug test in February 2014 showed she had used cocaine on consecutive days several months after the initial removal, so as to support J.R.W.'s continued removal. Thus, the trial court had before it evidence showing that T.M. committed acts that endangered the health and safety of her child. *See In re E.C.R.*, 402 S.W.3d at 248 ("If a parent has neglected, sexually abused, or otherwise endangered her child's physical health or safety, such that initial and continued removal are appropriate, the child has been 'remov[ed] from the parent under Chapter 262 for the abuse or neglect of the child.'") Because a reasonable

14

factfinder could have formed a firm belief or conviction that J.R.W. was removed from T.M. for abuse or neglect, we conclude that the evidence is legally sufficient. *See id.* at 249.

After considering the entire record, we conclude that the evidence is factually sufficient for a reasonable factfinder to have formed a firm belief that J.R.W. was removed from T.M.'s home for abuse or neglect. *See In re J.F.C.*, 96 S.W.3d at 266.[4] We therefore hold that the evidence is legally and factually sufficient to support the court's termination decree on the grounds of § 161.001(O). *See J.F.C.*, 96 S.W.3d at 265–66. Because we overrule T.M.'s second issue challenging the sufficiency of the evidence with respect to subsection (O), we need not consider her argument as to subsection (E). *See A.V.*, 113 S.W.3d at 362.

---

[4] Although T.M. states in the "Summary of the Argument" section of her brief that she "completed all the provisions of her court-ordered service plan," she does not present any argument in her discussion of the issues that she complied with the provisions of the court's order adopting the family services plan. Instead, T.M. asserts that "[a]ppellant's challenge to the legal and factual sufficiency of termination on [Subsection (O)] is simple: there was no evidence to remove J.R.W. from appellant's care for abuse or neglect, and thus no need to create a series of actions for mother to complete in order to obtain the return of her child[]." Thus, rather than argue that she substantially complied, T.M. asserts that because there was no abuse or neglect there was no need to create a family service plan with which she had to comply.

## 2.     Best Interests of the Child (§ 161.001(2))

T.M. also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship was in the child's best interest.  In determining whether termination of the mother's parental rights was in the child's best interest, we consider several non-exclusive factors, including (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child, (6) plans for the child by the person seeking custody, (7) stability of the home, (8) acts or omissions of the parent that may indicate that the parent-child relationship is improper, and (9) any excuse for acts or omissions of the parent.  *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  The Department is not required to prove all of these factors, and the absence of evidence about some factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in the child's best interest.  *See In re C.H.*, 89 S.W.3d at 27.  Evidence establishing one of the predicate acts under section 161.001(1) may also be relevant to determining the best interest of the child. *See id.* at 27–28.

### a. Child's desires and plans for the child

At the time of trial, J.R.W. was only a year old and was too young to testify about his desires. *See In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "The young age of the child render[s] consideration of the child's desires neutral." *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.). There was evidence that T.M.'s visits with J.R.W. went well and that mother and child had bonded. However, there was also evidence that J.R.W. was "happy and comfortable in [his foster] home, "ha[d] great interactions with his foster parent as well as with other members in the house," and that the foster parents wished to adopt him. In light of this evidence and J.R.W.'s age, the first *Holley* factor (i.e., the child's desires) is neutral in this case. The sixth *Holley* factor (i.e., plans for the child by the person seeking custody) is related to the first factor and is also neutral. While T.M. had her own apartment at the time of trial and planned for J.R.W. to live with her, the foster parents also expressed their desire to adopt him.

### b. Needs of the child, mother's parenting abilities, and stability of the home

The second and fourth *Holley* factors are related in our consideration of the best interests of the child. The second factor considers current and future physical and emotional needs, while the fourth considers the parental abilities of the person seeking custody. *In re A.S.*, No. 01-14-00113-CV, 2014 WL 3779022, at *9 (Tex.

17

App.—Houston [1st Dist.] July 31, 2014, pet. filed) (mem. op.). There was evidence showing that during her visits with J.R.W., T.M. interacted appropriately with him, changed his diapers, brushed his hair, and fed him. However, we note that because J.R.W. was removed at birth and had been in foster care since he was born, T.M. had never parented the child or cared for him for any length of time. The evidence also showed that all of J.R.W.'s physical and emotional needs were being met in his foster care placement, he had "great interactions" with all members of his foster family, he seemed happy and comfortable, and his foster parents wished to adopt him. This is some evidence that J.R.W.'s current and future emotional and physical needs would be appropriately met by termination of the mother's parental rights. *See In re S.T.*, 127 S.W.3d 371, 379 (Tex. App.—Beaumont 2004, no pet.) (holding evidence that foster parents met children's needs and plans for unrelated adoption were some evidence that termination of parental rights was in children's best interest).

The seventh *Holley* factor is the stability of the home. There was evidence that all of J.R.W.'s needs were being met in his foster placement and that he was eating and sleeping normally. There was also evidence that T.M. had an "appropriate" apartment and was prepared with tangible items needed to care for him, including clothing, toys, and diapers. However, we also note that T.M.'s February 2014 drug test showed that she had used cocaine on consecutive days in

18

the face of a court order conditioning her reunification on her ability to remain drug-free. A parent's drug use has been found to be a condition that can indicate instability in the home environment. *See P.W. v. Dep't of Family and Protective Svcs.*, 403 S.W.3d 471, 479 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.); *In re G.A.*, No. 01–11–00565–CV, 2012 WL 1068630, at \*6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.) (citing *Edwards v. Tex. Dep't of Protective Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no writ)). These factors weigh in favor of termination.

### c. Physical danger to the child and parental acts or omissions

The third factor is the current and future physical danger to the child. *Holley*, 544 S.W.2d at 371–72. The evidence showed that T.M. tested positive for marijuana, benzodiazepines, and opiates at J.R.W.'s birth. She also maintained a relationship with B.W. who used drugs and was on probation for possession of a controlled substance. In her report to the court, Finzetto stated that "[T.M.'s] ability to refrain from using substances is critical in determining her ability to properly care for her child." Nevertheless, during the pendency of the case, T.M. tested positive for cocaine use. T.M.'s inability to refrain from drug use, despite having completed substance abuse treatment to help her learn coping skills and remain drug-free, as well as her continued relationship with B.W., reflect an inability to perceive the danger that parental drug use would pose to a child. *See In*

19

*re G.A.*, 2012 WL 1068630, at \*6 (concluding father's concealment of drug use and continued relationship with mother who abused drugs, demonstrated father's inability to perceive danger that parental drug use posed to child). This factor supports termination.

Finally, we consider the eighth and ninth factors together. These factors consider acts or omissions of the parent that indicate the parent-child relationship is improper, as well as any excuses for them. *Holley*, 544 S.W.2d at 372. Although T.M. initially denied using marijuana, she subsequently admitted to smoking on or about the day J.R.W. was born. With regard to her positive test for benzodiazepines and opiates, T.M. denied having taken any pills and claimed that the positive test must be due to the medication her doctor had prescribed to her; medical personnel, however, stated that they never gave T.M. any medication that would cause her to test positive for those substances. Jeffries testified that the amount of cocaine detected in T.M.'s hair follicle sample collected on February 6, 2014, was indicative of using cocaine "[on] consecutive days, at least twice in a row." Although T.M. denied having used cocaine and later tested negative on a hair follicle test performed on March 12, 2014, there is no evidence in the record showing the period of time the test covered or the length of time drug usage is reflected in a hair follicle test, and therefore the later test results did little, if anything, to undermine the positive results obtained in February. *See In re Z.L.W.*,

20

No. 01-12-00736-CV, 2013 WL 396270, at *2 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) (concluding later drug tests arranged by mother did not undermine earlier positive results because evidence showed that earlier test used more sophisticated testing technique and reflected different period of time than later tests). Further, it was for the judge as finder of fact to resolve disputed questions based on its determination of the credibility of the witnesses. *See In re A.S.*, 2014 WL 3779022, at *10. These three factors support termination.

Viewing all the evidence in the light most favorable to the judgment, we conclude that a factfinder could have formed a firm belief or conviction that termination of T.M.'s parental rights was in J.R.W.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(2); *J.F.C.*, 96 S.W.3d at 265–66. Viewing the same evidence in a neutral light, the disputed evidence is not so significant as to prevent a factfinder from forming a firm belief or conviction that termination of T.M.'s parental rights was in J.R.W.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(2); *J.F.C.*, 96 S.W.3d at 265–66. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of T.M.'s parental rights was in J.R.W.'s best interest. We overrule T.M.'s third issue.

## Conclusion

We affirm the trial court's judgment.

21

                                        Jim Sharp
                                        Justice

Panel consists of Justices Higley, Bland, and Sharp.