

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00068-CV

IN THE INTEREST OF J.W.,
A CHILD

----------

FROM THE 431ST DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 15-01491-431

----------

### MEMORANDUM OPINION[1]

----------

After a trial, a jury found by clear and convincing evidence that the parent-child relationships between Appellant N.M.W. (Father) and E.M.R. (Mother) and their son J.W. should be terminated. The jury found by clear and convincing evidence that Father had engaged in conduct or knowingly placed J.W. with persons who had engaged in conduct which endangered his physical or

---

[1]*See* Tex. R. App. P. 47.4.

emotional well-being; had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of J.W., who had been in the temporary managing conservatorship of the Texas Department of Family and Protective Services (TDFPS) for not less than nine months as a result of his removal from the parent for abuse or neglect; and had knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and inability to care for J.W. for not less than two years from the date of the filing of the petition.[2] The jury also found by clear and convincing evidence that termination of the parent-child relationship between Father and J.W. was in J.W.'s best interest.[3] The trial court included the same four findings in its final order terminating the parent-child relationship between Father and J.W., and Father timely appealed. Mother did not appeal.

In four issues, Father contends that the evidence is legally and factually insufficient to support the findings. Because we hold that the evidence is legally and factually sufficient to support the jury verdict, we affirm the trial court's judgment.

## I. Background Facts

J.W. tested positive for Suboxone when he was born in June 2012. Suboxone is a synthetic drug used to treat drug addiction; it helps the patient

---

[2]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (O), (Q) (West Supp. 2015).

[3]*See id.* § 161.001(b)(2).

2

combat the urge to use drugs. Mother told Anitra Johnson, her TDFPS conservatorship worker at that time, that she had been taking Suboxone as prescribed by her doctor to help her avoid using hydrocodone and methamphetamine. Mother also admitted prior marijuana and Lortab use and drug use in general. Father testified that he had not known that Suboxone was harmful to the unborn child. He testified that he did not know why Mother was taking Suboxone during the pregnancy and had only learned it when Mother testified in the previous case. He had thought that it was safe because her psychiatrist had prescribed it.

Father also testified that Mother's drug use was not significant while they were together. But he later admitted that for Mother to be prescribed a drug to stay off other drugs, she had a "severe drug problem."

J.W. was removed from the parents and taken into the care of TDFPS. After his release from the hospital in July 2012, J.W. went to a foster home. At that time, Mother and Father were a couple and lived together. TDFPS was concerned about Mother's prescription and illegal drug use and Father's history of alcohol abuse. Father's criminal history was also a concern; Johnson testified that he had been arrested approximately twenty-one times between 2002 and the 2012 removal. But Father tested negative for drugs, and TDFPS was not concerned that he was abusing illegal drugs. Father testified that he had "sobered up right before" J.W. was born.

In November 2012, J.W. suffered a broken arm when his then foster

3

mother fell with him in her arms. She immediately took him to the emergency room and reported it to TDFPS on the hotline. In February 2013, Father noticed that the nipple of the bottle that had been sent to the visit by the foster parents had what appeared to be mold on it and drew the caseworker's attention to it.

Even though Mother and Father had not completed all their court-ordered services, at Mother's request and against the position of TDFPS, the trial court in that first case ordered a monitored return of J.W. to Mother in March 2013. By that time, Mother and Father had been broken up and living separately about five months.

Johnson visited Mother in the summer of 2013, and Father attended the meeting. Based on the parents' interactions at that meeting and the fact that Mother was pregnant again, Johnson believed that Mother and Father were back together.

Ultimately the case was dismissed in August or September of 2013. Mother was arrested in April 2014 for possession of marijuana and in October 2014 for possession of methamphetamine.

Father admitted in his testimony that TDFPS had valid concerns about returning J.W. to Mother as ordered after the first removal. Father testified that he "was kind of iffy about it" as well because he knew that the maternal grandmother (Grandmother), with whom Mother and J.W. were living, had "been known to use marijuana and stuff like that," but he stated that he was glad to have J.W. "close enough to where [he] could see [J.W.] a lot more." Father

clarified that "[t]hey weren't doing that" (presumably meaning that Grandmother and Mother were not using "marijuana and stuff like that") when J.W. was returned. Father admitted, though, that he never told TDFPS that Grandmother had an issue with marijuana. Father testified that when Mother was arrested in April 2014 for possession of methadone and marijuana, he was incarcerated. He also testified that he knew that she was arrested in October 2014 for possession but that he had not known that it was for methamphetamine.

Father admitted at trial that it was fair to say that from 2009 to 2014, he and Mother had problems with the law because of "decisions [they] made to have drugs that [they] weren't supposed to have" and, in his case, multiple DWIs.

In February 2015, Grandmother reported to TDFPS that

Mom was kind of in and out of the home. She would . . . drop [J.W.] off at the home certain periods of time. He would be dirty, appear to be very tired, and she'd just leave him, and this time she left him and she did not return and so [G]randmother called in the report because she was no longer able to keep him and care for him.

Cortney Copp, a former TDFPS investigator, testified that the referral received by TDFPS from Grandmother concerned neglectful supervision; there were concerns that Mother was abusing methamphetamine and prescription medications while taking care of J.W. Johnson testified that Grandmother had reported that Mother was going out and doing drugs with other men. Copp testified that Grandmother reported that Mother would both disappear with J.W. for extended periods of time and leave him with Grandmother for extended periods of time. Grandmother told Copp that when Mother took J.W. with her, he

5

would return looking malnourished and tired.

Johnson admitted that the report did not involve Father. The second removal was based on Mother's activities. Father and Mother were not together.

After making the referral, Grandmother took J.W. to the home of A.H., Father's sister. A.H. kept J.W. several days but could not continue to keep him at that time. Consequently, on February 25, 2015, about two weeks after the investigation began, J.W. was once again placed in foster care. Copp testified that TDFPS did not place J.W. with Father because Father refused to take a voluntary drug test, he had told her that he was looking at long-term confinement, he had a very lengthy criminal history, he was on bond and wearing an ankle monitor for a pending felony DWI, and he had known Mother was using drugs but failed to report her because of his fear that J.W. would be taken away. TDFPS decided within a month of J.W.'s second removal from his family to seek termination. TDFPS considered that it had already been involved with the family, that J.W. had been in care a good portion of his life, and that he needed permanency.

## II. Sufficiency of the Evidence to Support Termination

In his first issue, Father contends that the evidence is legally and factually insufficient to support the finding that he engaged in conduct, or knowingly placed J.W. with persons who engaged in conduct, which endangered his physical or emotional well-being. In his fourth issue, Father contends that the evidence is legally and factually insufficient to support the finding that termination

6

of the parent-child relationship between J.W. and himself is in J.W.'s best interest.

## A. Standards of Review

In evaluating the evidence for legal sufficiency, we determine whether the evidence is such that the jury could reasonably form a firm belief or conviction that Father engaged in conduct or knowingly placed J.W. with someone who engaged in conduct that endangered his physical or emotional well-being and that termination of the parent-child relationship between Father and J.W. is in J.W.'s best interest.[4]  We review all the evidence in the light most favorable to the findings and judgment.[5]  We resolve any disputed facts in favor of the findings if a reasonable factfinder could have done so.[6]  We disregard all evidence that a reasonable factfinder could have disbelieved.[7]  We consider undisputed evidence even if it is contrary to the findings.[8]  That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.[9]

---

[4]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (b)(2); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

[5]*J.P.B.*, 180 S.W.3d at 573.

[6]*Id.*

[7]*Id.*

[8]*Id.*

[9]*See id.*

7

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province.[10] And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.[11]

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship.[12] In reviewing the evidence for factual sufficiency, we give due deference to the jury findings and do not supplant the verdict with our own.[13] We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Father violated subsection (E) of section 161.001(b)(1) and that termination of the parent-child relationship between Father and J.W. is in J.W.'s best interest.[14]

### B. Endangerment

#### 1. The Law

As this court has often discussed,

Endangerment means to expose to loss or injury, to jeopardize. . . .

---

[10]*Id.* at 573–74.

[11]*Id.* at 573.

[12]*In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014).

[13]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

[14]Tex. Fam. Code Ann. § 161.001(b)(1)(E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

8

. . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. . . .

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's wellbeing may be inferred from parental misconduct alone. . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

. . . .

Further, even though imprisonment alone does not prove that a parent engaged in a continuing course of conduct that endangered the physical or emotional well-being of his child, it is nevertheless a factor that we may properly consider on the issue of endangerment.[15]

## 2. Application of the Law to the Facts

### a. J.W.'s Condition at the Time of Removal

The evidence showed that J.W. was malnourished, underweight, and developmentally, physically, and emotionally delayed at the time of the removal. Lorinda Gomez, a volunteer advocate for Court Appointed Special Advocates (CASA), testified that she had been involved in the case since the February 2015 removal. She testified that when J.W. first came into care, he was very distant, did not want contact with anyone, and had no curiosity. He would not look at her when they first met. He ran, sat in the floor, rocked back and forth, and "zone[d] out."

---

[15]*In re I.C.*, No. 02-15-00300-CV, 2016 WL 1394539, at *7 (Tex. App.— Fort Worth Apr. 7, 2016, no. pet.) (citations and internal quotation marks omitted).

Roxanne Wyckhoff, J.W.'s play therapist, testified that she had seen J.W. biweekly since March 2015, "almost right at a year." She stated that J.W. had good eye contact from the beginning but that often "his verbal communication was very poor." For his age, his "words were limited" and "very difficult to understand." He never tried to sit in her lap or the foster parents' laps. He did not seek or want affection, which Wyckhoff stated is not normal for a two-year-old.

Dr. Paul Cuppett evaluated J.W. on April 20, 2015, about two months after the removal, and reported:

> Assessment of [J.W.'s] development finds him to be behind his same age peers. His speech, daily living, social, and motor skills are all . . . at or below the 10th percentile which is likely reflective of his neglectful home environment.
>
> His development of visual motor integration is low as well. There are numerous behavioral indicators to suggest his experience of excessive anxiousness and fearfulness, i.e. zoning out, gastrointestinal upset, difficulty with change in routine, nightmares, and fearfulness.

Father agreed that the condition of J.W. when he first came into care—being hungry all the time and malnourished, having trouble talking, and exhibiting aggression, was "a pretty terrible state for a three-year-old to be in." Father admitted that every time he was incarcerated, he failed J.W, that during J.W.'s short life, Father and Mother had each been incarcerated at least twice, and that he and Mother had created the instability in J.W.'s life.

10

### b. Father's Knowledge of Mother's Drug Use

The jury heard evidence that Father was aware that Mother was using drugs while J.W. was in her care. Father admitted in his testimony that he had not kept J.W. away from people who were using drugs. Copp testified that Father had told her that he had seen a pipe in the apartment when he and Mother lived together and that Mother denied that it was hers, but Copp was initially unsure when that incident occurred. Copp later testified that Father had told her that it had happened when he and Mother had lived together a year earlier. Father testified that he had seen the pipe in Grandmother's house "sometime [in] early 2014."

Johnson testified that Father told her at the adversary hearing that he had tried to get the police involved because of his concerns about Mother's drug use, but Johnson testified that TDFPS had not received any reports indicating that law enforcement had been notified of child neglect or abuse before Grandmother made the referral. Copp also admitted that Father had told her that he reported Mother's use of methamphetamine to a security guard at a casino in Oklahoma. Copp testified similarly to Johnson, however, that Father had told her that he had been aware of Mother's drug usage for "quite a while" but did not want to report anything because he did not want J.W. removed from the home or living anywhere else; he did not want J.W. taken into TDFPS's custody. Copp testified that Father had told her that he had been trying to check on J.W.'s welfare before the investigation began and had made numerous phone calls to Grandmother

11

and Mother that were not returned. Copp also testified that Father had told her that he had not seen J.W. for a month or two before the investigation because Mother was missing.

Father testified that he did not report Mother's drug use precipitating J.W.'s second removal to TDFPS because of the moldy bottle and the fractured arm J.W. had suffered the first time he went to foster care. Father said that his fear of losing J.W. to "the system" was greater than his concern of J.W. being in the care of someone using drugs. Father testified that Mother's drug use

> only got real bad—[he] was only aware of it being bad until . . . [his] release of state jail. [He] noticed that it was getting bad, and then [he] . . . had [his] suspicions and then it was only real bad a couple months prior to [TDFPS's involvement], and [he] did notify the authorities of it. [He] did everything [he] could. [He] was asking all [his] family to help and everything [he] could to get [J.W.] from [Mother's] care.

Father admitted that two months is a lot of time in the life of a three-year-old.

### c. Father's Alcohol Issues and Criminal History

Father admitted that alcohol had affected him as an adult and that he had been in and out of prison since he had been old enough to go. Father also testified that he had three other children. He was not certain of the birth year of the oldest and did not know the birthdays of the other two children because he had "been out of [those] children's [lives] for a very long time." He admitted that he had been incarcerated most of the time since those children were born. Father admitted committing many crimes, including criminal trespass, forging and

12

altering a prescription, public intoxication, evading a police officer, burglary of a motor vehicle, failing to identify himself to a police officer, possession of a controlled substance (Xanax and hydrocodone), possession of a controlled substance (again), unauthorized use of a motor vehicle, felony DWI, and debit card abuse. He committed the debit card abuse while J.W. was in foster care the first time.

Father was arrested for felony DWI, his second, in April 2014. Although he did not remember it, Father had hit a parked car. Before the accident, he had consumed about eight tall boys at his brother's house. He testified that he drove after drinking because he had received a call from Mother stating that Grandmother's boyfriend was abusing J.W. and coming on to Mother. At the end of June 2015, Father's bond on the felony DWI was revoked, and he was arrested for failure to appear at a court setting and failure to pay child support. By the time of the termination trial, Father had been sentenced to three years' confinement on the felony DWI.

Both Copp and Johnson testified that Father has an issue with alcohol, as evidenced by his multiple DWIs. But Copp testified that Father did not acknowledge having problems with alcohol when she talked to him and that he told her that he had not drunk alcohol in a while. She did not believe that he had taken any responsibility for the alcohol issues that had led to his most recent felony DWI.

13

### d. Witnesses' Conclusions on Endangerment

Father admitted that he had not proved that he could protect J.W. in the past, that he was not protecting J.W. at the time of trial, and that he was not able to protect him. Copp testified that TDFPS believed that Father had engaged in conduct or knowingly placed J.W. with people—Mother—who had endangered him. TDFPS was concerned about Father's not reporting his knowledge of Mother's drug usage because of his fear that J.W. would be taken away. TDFPS was also concerned about Father's alcohol abuse and related criminal issues. TDFPS believed that Father's arrests and conduct endangered J.W.'s emotional and physical well-being. TDFPS was further concerned that Father's incarceration would mean that Father could not care for J.W. and would emotionally injure him.

Rochelle Ramirez, the conservatorship worker from August 2015 to the date of trial, testified that she believed Father engaged in conduct and knowingly placed J.W. with persons who had engaged in conduct that endangered his emotional well-being because Father knew that Mother was doing drugs while caring for J.W. as early as the end of the first CPS case, well over a year before the second removal. Further, Ramirez believed that Father endangered J.W. by not "showing the most appropriate protective capacities." Specifically, Ramirez testified that Father should have contacted Texas law enforcement and TDFPS about Mother's drug use after the 2013 return of J.W. Ramirez further testified that Father's numerous arrests and his being in and out of jail throughout J.W.'s

14

life emotionally harmed J.W. Finally, Ramirez testified that returning J.W. to Father would result in emotional and physical danger to J.W.

### e. Disposition

The jury heard the evidence concerning Mother's drug use while caring for J.W., J.W.'s condition at the time of removal, Father's many incarcerations, his alcohol abuse, and his failure to promptly report both that Mother was using drugs while caring for J.W. and that Mother was missing. The jury also heard TDFPS personnel explain why they believed that evidence satisfied subsection (E). We therefore hold that the evidence is legally and factually sufficient to support the endangerment finding under subsection (E). We overrule Father's first issue.

### C. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest.[16]

We review the entire record to determine the child's best interest.[17] The same evidence may be probative of both the subsection (1) ground and best interest.[18] Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include

---

[16] *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[17] *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

[18] *Id.* at 249; *C.H.*, 89 S.W.3d at 28.

15

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.[19]

These factors are not exhaustive, and some listed factors may be inapplicable to some cases.[20]  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.[21]  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[22]

---

[19]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

[20]*C.H.*, 89 S.W.3d at 27.

[21]*Id.*

[22]*Id.*

## 1. The Parties' Plans for J.W. and J.W.'s Desires

The evidence showed that Father cared about J.W. and his well-being, and there was testimony that they had a close relationship before the second removal. Johnson testified that J.W. knew who Father was at the two visits they had and would say, "Daddy" when he saw Father.

But Father admitted in his testimony that he had last seen J.W. ten months before trial. Copp testified that she set up three different visits for Father in the two-week period after the second removal and before the adversary hearing. He did not attend any. For the first four months after J.W. was removed in 2015, Father was not incarcerated and could have visited with J.W. each week, excluding any week when the child was sick.

While Father claimed that this time, he would stay sober and that he had a different outlook since J.W. was born in 2012, he admitted at trial that he could not currently provide the care that J.W. would need because he was in prison. Until he was able to raise J.W., Father wanted his "parents mixed with [his] sister" A.H. to have custody of J.W. Specifically, he "would like to see [J.W.] go with [his] family, have [his] family work it out until [he] get[s] out on parole." Father testified that his mandatory release date was seven months from trial and that he would be released in nine months if he did not "catch another case."

TDFPS's plan for J.W. was adoption by his then foster parents after termination of the parents' rights.

Ramirez and Gomez testified that J.W. was too young to express his

desires.  But Gomez testified that she believed that he was happy living with the foster family.

### 2.  J.W.'s Needs

Except for a brief time in respite care while the foster family was on vacation, J.W. had lived with the same foster family since his second removal on February 25, 2015.  The foster father was a firefighter and SWAT team member, and the foster mother was a nurse who worked part-time.  The foster mother worked two twelve-hour shifts per week.  Her husband worked shifts of twenty-four hours on and forty-eight hours off.  That way, one parent was always at home.  The children were never with a babysitter.

The foster mother described J.W.'s behavior when he arrived:

> When he first came to our home, any time we would get near him he would start screaming and crying.  He would let you in a little bit on some days and then some days he wouldn't.

> During bath time the first night[] he came to us[,] . . . [w]e went to the bathroom and turned the water on and he started screaming, so we kind of talked him through what we were going to do, how bath time was going to go.  We put bubbles in.  He was still screaming, so we just decided we were going to stick our feet in and kind of play with him and get him used to the water.

> So we did that for a little bit, and we kind of slowly progressed into bathing.  He was climbing up the wall one day because he didn't want to take a bath.  Now he likes bath time, and he wants to go run and jump in there and splash as much as he can.

> There were days where he would scream and just rock.  There was concerns because he would just zone out and stare.  He was licking our glass . . . door, . . . , and we didn't understand why he was doing that.  He would just zone out and drool for a while whenever we first got him.

18

Additionally, she discussed his bedtime and sleep routines:

> He would lay in bed and he would rock back and forth. He couldn't self-soothe. He would lick the wall . . . because the bed's pushed up against a wall. He would run around at night screaming and crying. He would wake up all throughout the night. He's still yet to sleep a full night. We still wake up.
>
> . . . .
>
> . . . 6:30 to 7:00 was when he wanted to go to bed, and we would try to keep him up later and he would just scream and cry. We thought, okay, he's got to be exhausted, but when he would be in bed, he would hold the covers over his head and suck his thumb.

The foster mother testified that he still was not sleeping through the night, even after a year, and that they had "six hours of sleep in a stretch maybe, but never more than that."

The foster mother testified that J.W. did not appear to be bonded to anyone or anything when he arrived at her home except his blanket, which he called "Baby."

Wyckhoff testified that J.W. bonded with his foster father easily but had a hard time bonding with the foster mother, which concerned the foster mother because she knew that he needed to bond to thrive. In the late summer of 2015, however, the foster family went out of town without J.W. He stayed in respite care during that brief time. After the foster family returned, J.W. "did a turnaround and totally bonded with Foster Mom and never did any of the screaming, disconnected behaviors that he had done before."

Wyckhoff testified that J.W. had blended well and bonded with the entire

19

family.  He would draw pictures of the family and for the foster mother.  He also talked of the foster family as his family—"his siblings, his mom and dad."

Gomez, the CASA advocate, agreed that although J.W. had trouble bonding with the foster mother originally, by the time of trial, "he [was] all over her," "really bonded with her[,] and trust[ed] her."  Gomez testified that J.W. was also now "really attached to" the entire foster family, which includes three other children.

When asked why J.W. had trouble bonding with her, the foster mother answered,

> I have no idea.  I—honestly, it was I would try to get close to him and he would push me away or he would start screaming.  So we started working with a play therapist on seeing how we can help him bond with us.  So her thoughts were whenever he just screams, I get as close to him as I can and then I sit there for a little bit, and then if he'll let me, I'll get a little bit closer and then I can sit a little bit closer to him.  And so we just slowly worked it with bonding that way.

> We would go pick him up from day care, and he would just scream and cry so it was a laughing joke in the day care whenever we pulled up that we pull earplugs out.  And I would be holding him out, and he would just be kicking and screaming and fighting me the whole time I'd put him in his car seat.

> On the drive home he would finally start calming down, once we kind of talked about we're going to go home, this is what we're going to do, this is—we're going to go home.  We're going to play. We're going to eat dinner.  We're going to have bath time.  He always wants to know what's coming next in every day.

The foster mother stated that her three children were ages eleven, nine, and eight at the time of trial, that they treated J.W. like a brother, and that J.W. considered them his best friends.  She stated that J.W. would say, "[M]y kids are

20

here," when the school bus delivered them each afternoon, and he would run to the door to wait for them to come in.

The foster mother further testified that she started seeking medical answers for J.W.'s behaviors that were different from typical children his age early on. They

> had to fill out a whole bunch of questionnaires and take papers home and see if he could build blocks, if he learned—knew how to kick, how many words he could do. And then they recommended that he go see an occupational therapist and a speech therapist, so we got those evaluations done. And then we also started him in play therapy.

The foster mother explained that J.W. also underwent a neurological exam to rule out seizures because "he would just look at you and zone out, but he was looking through you. . . . [H]e was never making . . . eye contact, and he would start drooling." The doctors "said he was not having seizures. They thought it was a defense mechanism." At the time of trial, J.W. was scheduled for an all-day exam at Children's Medical Center in Dallas, and after he was "cleared" there, he would go to the autistic clinic.

J.W. was discharged from speech therapy because he was not able to make enough progress. His therapist believed other areas in occupational therapy needed work first. Wyckhoff testified that he still had some aggression in school, where he would throw things, hit, and kick.

Given his low level of maturity for his age, which is now four years old, the foster mother told Gomez that the foster parents would like to keep him at home

21

more to get him more comfortable with his situation and increase his trust while at the same time taking him to all his therapy appointments and then put him in school after the testing is completed.

Ramirez testified that the foster parents are only in the beginning stages of trying to get a diagnosis for J.W. She stated that that will require a lot of patience, resources, time, and stability, none of which Father could provide.

While A.H. denied that J.W. had exhibited any abnormal behavior when she took care of him before he was placed with the foster family, she stated that if J.W. were placed with her, she and the extended paternal family would get him to his medical and therapeutic appointments.

Wyckhoff testified that J.W.'s lack of stability before entering foster care the second time absolutely could have impacted his behavior upon re-entering foster care. When asked whether stability was important for a child with special needs, Wyckhoff testified,

> It most definitely is. . . . [A]ll children need structure. They need boundaries. They need consistency. They need dependability. They need nurturing. All those things are very, very necessary for a child to be able to trust. If a child's not able to trust, it creates problems in his life usually for the rest of his life.

Gomez testified that "stability is the most important thing for [J.W.] and to be placed with family and not knowing exactly if he would stay there the whole time" would be "a big concern" to her. She testified that he needed structure and consistency. Gomez testified that placing J.W. with the paternal family collectively during Father's stay in prison would also cause J.W.'s ability to bond

22

to regress: "[I]t's almost been a year, and even now he's still—it's difficult for him to bond with just anybody. It takes time and consistency and just pure patience."

Ramirez stated that being bounced around while Father was in prison would cause J.W. to regress dramatically.

Wyckhoff testified that J.W. had never talked about his birth parents or the extended paternal family and that she was not aware that he had any familiarity with them. She believed that this lack of familiarity would impede his bonding with them. She further testified that if J.W. were returned to Father but Father left him in his other family members' care during Father's prison stay, J.W. would be negatively impacted. She testified that she would have "extreme concern" if J.W. were to be moved because there could be "multiple disruptions." She believed that with a move, J.W.'s behaviors would regress, and she worried that based on the potential severity of his behavior, the next home might not keep him.

The foster mother thought that Father's plan of having extended family care for J.W. while Father was in prison was not good for J.W. because after a year, he had finally bonded with the foster family and felt comfortable and safe.

### 3. Witnesses' Conclusions on J.W.'s Best Interest

The foster mother testified that she believed her plan for J.W. would be in his best interest, that she could meet his present and future emotional and physical needs, that she felt that she and her husband had strong parenting abilities, that she had identified programs to help her husband and her promote J.W.'s best interest, and that their home was stable.

23

Ramirez, Wyckhoff, and Gomez all testified that remaining with the foster parents would be in J.W.'s best interest and that the foster parents could provide for his present and future emotional and physical needs. Gomez and Ramirez both testified that termination of Father's parental rights would be in J.W.'s best interest. Gomez testified that CASA's opinion as to J.W.'s best interest

> [was] that he remain in the current foster home. . . . [T]alking with all of his teachers, all of the people he's interacted with, all the doctors, one of things they have said is consistency—consistency and stability and a loving environment is in the best interest of [J.W.], and at this point in time the foster family has provided all of that for him. They truly make an effort. They go above and b[ey]ond to make sure . . . all his needs are met.

Wyckhoff testified that the foster family had

> demonstrated their ability to care for [J.W.]. They are aware of his behaviors. They've seen him at his worst and have never hesitated to care for him based on his behavior.
>
> The hesitation they had, as we discussed earlier, was if his ability to bond with [the foster mother] was not corrected, they did not feel like that was a positive environment for him. But as far as his behaviors, they've, you know, worked with him. They've addressed those issues. They know.
>
> And I think, you know, from my experience in working with a lot of families, they would have . . . given what we call a 30-day notice, which is saying "CPS, get this kid out. We can't handle his behavior." And they have never talked about that with me in any way.

Wyckhoff believed that the foster parents were able to provide a safe and stable home for J.W. and that they would continue to meet his needs. She had worked with the foster parents, teaching them how to interact with J.W. when he had aggression, and she testified that they had been able to implement the

24

techniques and that she believed that they would continue to be able to do so in the future.

Neither Gomez nor Ramirez believed that Father could provide for J.W.'s present and future emotional and physical needs. They both also testified that Father had no acceptable excuse for his conduct since J.W. was born.

Gomez further testified that the foster parents had the parenting abilities to take care of J.W.'s special needs, that Father did not, that the foster parents had a plan and programs to help them promote J.W.'s best interest, that Father did not, that the foster parents' plan for J.W.'s future was better than Father's plan for allowing him to stay with various family members until Father's release from prison, and that the foster parents' plan provided stability but Father's did not.

### 4. Disposition

In addition to the evidence of J.W.'s endangerment, the jury heard the evidence of Father's plans and TDFPS's plans. The jury heard about J.W.'s condition at the time of removal, his improvement by trial, and his persistent special needs. They heard how important stability was for J.W.'s well-being. Given the specific evidence in this case, we hold that the evidence is legally and factually sufficient to support the best interest finding. We overrule Father's fourth issue.

When there is a finding that termination is in the best interest of the child, only one predicate finding under section 161.001(b)(1) is necessary to support a

termination judgment.[23]  Because we have upheld both the endangerment finding and the best interest finding, we do not reach Father's second and third issues challenging other findings.[24]

## III. Conclusion

Having overruled Father's first and fourth issues, which are dispositive, we affirm the trial court's judgment.

PER CURIAM

PANEL:  DAUPHINOT, J.; LIVINGSTON, C.J.; and SUDDERTH, J.

DELIVERED:  August 4, 2016

---

[23]*See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

[24]*See id.*; *see also* Tex. R. App. P. 47.1.