**Opinion issued November 22, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-16-00450-CV**

———————————

**IN RE T. R. H.**

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-02985J**

---

**MEMORANDUM OPINION**

This is an accelerated appeal from a judgment terminating Mother's parental

rights to T.R.H.  We affirm.

**BACKGROUND**

Mother had two children.  The oldest, K.H, was 11-months old when T.R.H.

(the subject of this suit) was born.  Sometime in the year following T.R.H.'s birth,

K.H. died. His death was ruled a homicide, and charges were brought against his caregiver. Mother maintained custody of T.R.H.

When CPS recommended a psychiatric evaluation of Mother following K.H.'s death, she cooperated. K.H.'s death was the first occasion CPS ("the Department") had to investigate Mother. Mother failed a drug test, and Mother's caseworker learned that Mother had a history of leaving her children with various caregivers. The Department opened an investigation out of concern that Mother "may not possess the cognitive abilities to care for" T.R.H.

During her evaluation, Mother reported that she has no work history and had dropped out of high school, but had returned to try to earn a high school diploma. She reported to the doctor that she smokes marihuana every day. The evaluator was concerned about Mother's taking inadequate care of her 1-year-old son, T.R.H., during the evaluation. Mother did not bring T.R.H. to the evaluation in a car seat, and T.R.H. was wearing dirty clothes. T.R.H.'s diaper needed changing, which Mother resisted doing until the evaluator insisted.

Mother had trouble controlling T.R.H.'s behavior. Mother was encouraged to feed T.R.H. during the evaluation, but Mother only provided him with a baby bottle of water. The evaluator offered food, which immediately calmed T.R.H. down. The evaluator surmised that either Mother was incapable of recognizing when her child was hungry or that Mother did not have food to feed him. When it

became clear that T.R.H. was sleepy, the evaluator observed that Mother lacked "maternal connection to the naptime process" and did not know how to "utilize any soothing techniques with the child."

Mother's intelligence was estimated to be in the below-average range, and she demonstrated memory difficulties. But she exhibited an appropriate range of emotional expression. Mother showed concern regarding the wellbeing of her children and expressed a desire to raise her children.

The following opinion and recommendations were given following the evaluation:

> One challenge for [Mother] is her history of leaving her children with various caregivers. It does not appear as if the client uses good and/or rationale judgment regarding the care of her children. Another challenge is her cognitive abilities. Cognitive testing suggests she falls in the below average range of intellectual functioning. Another challenge for her is being overwhelmed with caring for her son. It is unclear at what age the child would need to be in order for [Mother] to care for the child; however, two scenarios can be given. The child would have to be old enough to care for himself independently and/or [Mother] would have to acquire the skills to needed to care for her son. Another challenge is the possibility of unresolved grief regarding the death of her first-born son, [K.H.]. One strength is her ability to comply with the CPS requirements. She appeared concerned about the well being of her son but it is unclear if she has a good understanding of what is needed to adequately raise him.

> Given this information, the following treatment suggestions are outlined below.

> RECOMMENDATIONS

> 1. [Mother] would benefit from parenting classes to assist her in understanding, and responding to the physical, emotional, developmental, and intellectual needs of her children.

2.  [Mother] would benefit individual counseling. She has a number of unresolved family issues that may be impacting her ability to effectively parent.

3.  [Mother] would benefit from grief counseling. It is unclear whether or not [Mother] appropriately grieved the death of her first-born son, [K.H.], and her inability to appropriately grieve may be impacting her parenting skills.

4.  [Mother] would benefit from a referral from the Texas Workforce Commission. [Mother] reported she has never been employed. Based on behavioral observations, she may not possess the skills needed to secure employment. She may be able to utilize their services in order to secure employment appropriate for her level of skills.

## A. Mother's Family Service Plan

The Department did not seek to remove T.R.H. from Mother's care or seek temporary managing conservatorship until Mother tested positive for marihuana and cocaine. On July 8, 2015, after T.R.H. was removed, Mother agreed to a Family Service Plan. The goal was reunification with Mother, and the target services completion date was June 6, 2016. The July 8, 2015 Family Service Plan identified the following concerns, goals, and required services:

**INITIAL CONCERNS:**

[Mother] has not demonstrated that she is able to care for her young son.

Prior to CPS removing [Mother]'s son, it was recommended that she complete services In Family Based Safety Services and she did not.

[Mother] did not complete the required services in FBSS.

[Mother] does not understand the reason for CPS intervention and continues to minimize the agency's efforts to assist her.

4

**SERVICE PLAN GOALS (CHANGES NEEDED TO REDUCE RISK):**

[Mother] will show the ability to parent and protect the child.

[Mother] will learn how her emotions and behavior may effect the emotions and behaviors of the child.

[Mother] will demonstrate the ability to put the needs of her child ahead of her own.

[Mother] will demonstrate the ability to protect child from future abuse or neglect and will show concern for future safety of her child.

[Mother] will demonstrate an ability to change the pattern of behaving that resulted in abuse/neglect.

**TASKS AND SERVICES**

1. COMPLETE and PARTICIPATE in INDIVIDUAL COUNSELING: [Mother] will participate in and successfully complete Individual therapy. DFPS will refer for these services. If the client reschedules/misses two appointments then she will be financially responsible for obtaining the service.

2. [Mother] will provide her current caseworker with any and all sources of income for herself by the 15th of each month. Proof of income may include: Social Security award letters, Food Stamp certification papers, pay check stubs. If [Mother] is not currently working, she must provide her caseworker with proof of her registration with The Worksource, and a list of at least 3 employers (name and telephone number) that she has submitted an application and/or resume to per week. This list is due to the DFPS caseworker by the last day of each month.

3. MAINTAIN/OBTAIN STABLE HOUSING: [Mother] will maintain stable and safe housing for a minimum of six months consecutively. She will demonstrate that she can provide housing that will protect her children and provide the consistency and stability that they need. [Mother] will provide the DFPS worker with a current lease along with current utility bills to show proof of a safe and structured home environment. In the event that another occupant moves into [Mother] current residence, she will provide the current CPS caseworker with the

current occupant's name, date of birth, social security numbers, and copy(s) of needed Identifying information for that person within 48 hours of their occupying the current residence. [Mother] will allow her DFPS caseworker access to her current residence to verify safety. If [Mother] moves, she will notify her current caseworker within 24 hours of the relocation, and provide new leasing information for the current residence.

4.  MAINTAIN CONTACT WITH THE AGENCY: [Mother] will maintain contact with her assigned DFPS caseworker. . . . . . [Mother] is to provide her case worker with accurate phone number and address so that she can be notified of family visits and information pertaining to her case. In the event that [Mother] is unable to be reached, she needs to ensure that her case worker has an emergency contact number that she can be reached at.

5.  [Mother] will participate in drug/alcohol testing upon request by DFPS or a provider. [Mother] will show progress by testing negative for drugs or alcohol. Any refusal of drug/alcohol testing will be considered as testing positive. Any missed appointment will be considered as testing positive.

6.  [Mother] will participate and complete a drug/alcohol assessment and follow all recommendations which may include but are not limited to: in-patient treatment, out-patient treatment, after-care programs, intensive programs, support groups (such as AA or NA), and substance abuse therapy. DFPS will refer for these services.

7.  [Mother] will participate in and successfully complete a psychosocial assessment and follow all recommendations. DFPS will refer for these services. If the client reschedules/misses two appointments then she will be financially responsible for obtaining the service.

## THE TRIAL

At the May 4, 2016 trial seeking termination of Mother's parental rights, neither Mother nor either alleged father attended, but there was an attorney appointed to represent each of their interests, as well as the interests of T.R.H.

6

Before trial started, the following documents were admitted into evidence: (1) Mother's April 28, 2015 Psychological Evaluation, (2) Mother's drug test results from July 16, 2015 reflecting marihuana in her system, (3) Mother's Family Service Plan, and (4) a July 16, 2015 Status Hearing Order. Mother's Department caseworker, J. Green, testified. Green testified that the Department sought to help Mother after the death of K.H., while T.R.H. remained in her custody. The Department sought removal of T.R.H. after Mother failed her drug screens and it was determined that Mother did not have the ability to care for T.R.H. and that she was not following the safety plan put in place as a condition of T.R.H. remaining in her care.

Green testified that T.R.H. is currently placed in a private agency foster-to-adopt home. The Department considered a potential paternal aunt for adoption, but her "DNA came back that she is 20 times unlikely to be the paternal aunt." She still remains a possibility though, as an adoptive placement, because it is possible that she is a half sibling of one of T.R.H.'s alleged fathers, rather than a full sibling as the Department initially understood.

Green testified that, out of the entire laundry list of services Mother was required to perform under her Family Service Plan, the only task she completed was the psychological assessment. Further, the Department timely referred Mother for each of her services, and she did not show up the referrals. She did not attend

any requested random drug screening, and would not return to the psychologist that did her initial evaluation for subsequent services, telling Green that "she didn't know how to get there." Green testified that Mother is not employed, and does not consistently visit T.R.H.

Green stated that the Department was seeking to terminate Mother's parental rights on three grounds (1) "she engaged in conduct that endangered her child based on her drug tests," (2) "she constructively abandoned her child based on her failure to visit significantly during the case," and (3) she "fail[ed] to work her family plan of service."

Finally, Green testified that termination of Mother's rights was in T.R.H.'s best interest because he in a "safe, stable environment." He is in a long-term placement that offers stability and is doing much better than he did when he was with Mother.

On cross-examination, Green explained that Mother's visits were sporadic. She started visiting once a month. After she was an hour late to one of those visits, Green made it Mother's responsibility to call and schedule visits. After that, Mother would visit once every two months.

Green also testified that the alleged paternal aunt's home study would have been approved and T.R.H. placed there if the Department had determined that the alleged aunt was actually related to T.R.H. Because T.R.H. had a previous

relationship with this alleged aunt, placing him with her would have been in T.R.H.'s best interest at that point.

Green further explained that T.R.H. was initially placed with a maternal cousin. He was removed, however, because he was not being properly taken care of. He has been in his current foster placement since then, for about a year. He is doing very well in that placement, and the foster parent wishes to adopt him.

The court announced that it would terminate on all three grounds sought by the Department and granted the ad litem's request for a "no-move" order to ensure T.R.H. was not moved out of his current placement without ad litem approval.

The court memorialize his ruling in a final judgment terminating Mother's rights on the following grounds:

6. Termination of Respondent Mother []'s Parental Rights

6.1. The Court finds by clear and convincing evidence that termination of the parent child relationship between [Mother] and the child, [T.R.H.], the subject of this suit is in the child's best interest.

6.2. Further, the Court finds by clear and convincing evidence that [Mother] has:

6.2.1. engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to §161.001[(b)](1)(E), Texas Family Code;

6.2.2. constructive]y abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made

9

reasonable efforts to return the child to the mother; (2) the mother has not regularly visited or maintained significant contact with the child; and (3) the mother has demonstrated an inability to provide the child with a safe environment, pursuant to §161,001[(b)](1)(N), Texas Family Code;

6.2.3. failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to §161.001[(b)](1)(O), Texas Family Code;

6.3 IT IS THEREFORE ORDERED AND DECREED that the parent-child relationship between [Mother] and the child, [T.R.H.], the subject of this suit is finally and forever terminated.

## ISSUES ON APPEAL

Mother raises the following issues on appeal:

Issue I:   Was the evidence legally and factually sufficient to support the termination of appellant's parental rights under §161.001(b)(1)(N)?

Issue II:   Was the evidence legally and factually sufficient to support the termination of appellant's parental rights under §161.001(b)(1)(E)?

Issue III: Was the evidence legally and factually sufficient to support the termination of appellant's parental rights under §161.001(b)(1)(O)?

Issue IV: Was the evidence legally and factually sufficient to support the best interest termination finding?

10

**APPLICABLE LAW AND STANDARD OF REVIEW**

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see also In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003) ("[A] parent's interest in maintaining custody of and raising his or her child is paramount."). Therefore, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id*.

In a case to terminate parental rights by the Department under § 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b) (West 2008). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

established." TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *A.V.*, 113 S.W.3d at 362.

In a legal sufficiency review in a parental-rights-termination case, the appellate court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If, after conducting a legal sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.*

In conducting a factual-sufficiency review in a parental-rights termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm conviction or belief about the truth of the matter on which the Department bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable

factfinder could not have resolved the disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## A. Sufficiency of the Evidence to Support Termination Under Section 161.001(b)(1)(O)

Subsection (O) allows termination when the parent has failed to satisfy conditions of a service plan. Specifically, it provides that the court can order termination upon a finding, by clear and convincing evidence, that a parent:

> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (West 2008). Texas courts generally take a strict approach to subsection (O)'s application. *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.). The burden of complying with the court order is on the parent. *Id.* at 878. Courts do not measure the "quantity of failure" or "degree of compliance." *Id.* at 877. Rather, courts only look for a parent's failure to comply. *See In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009,

13

no pet.) (holding subsection (O) does not intend an evaluation of a parent's partial achievement of plan requirements); *see also In re A.W.*, 01-15-01030-CV, 2016 WL 3022824, at *7 (Tex. App.—Houston [1st Dist.] May 26, 2016, no. pet.) (mem. op.) (holding substantial compliance with a court-ordered service plan may be insufficient to avoid termination).

Despite this strict approach, the Department must present evidence that a court-ordered plan established specific actions the parent must take for the return of the child. *D.N.*, 405 S.W.3d at 877–78. In other words, the service plan must be specific enough to allow Mother's compliance to be objectively measured. *Id.* at 878.

With regard to subsection (O), Mother's sole argument on appeal is that the Department did not establish by clear and convincing evidence that Mother failed to complete her family plan services because the testimony and evidence on this topic was allegedly too vague. Mother concedes that Green unequivocally testified that, as of the date of trial, Mother had not completed any of her services required, except the psychological assessment. Green testified that Mother did not go back to the psychologist when she was referred, but Mother complains that Green did not specify the date of the referral so that it is impossible to know if the Family Service Plan was in effect. She makes the same argument about the drug tests that Mother did not show up for. The Family Service Plan required Mother to

"randomly drug test" and Green testified that she requested that Mother take those tests "on several occasions," but that Mother failed to comply. Mother insists that the Department should have put on evidence of each date that Mother did not comply.

Taking Green's evidence as a whole, we disagree with Mother that the evidence is legally and factually insufficient to demonstrate that Mother did not complete the required services under section 161001(b)(1)(O). Green testified that Mother had not completed her service tasks, and then gave numerous examples (such as not showing up for any requested drug test). Mother's argument that Green's testimony lacked specific dates notwithstanding, the fair inference from Green's testimony, taken in context, is that she was discussing examples of Mother's failure to comply with services. It would be nonsensical to assume, as Mother asks us to do, that despite the Family Service Plan required the Department to subject Mother to random drug screens, the Department would have only requested drug screens *before* the Family Service Plan was implemented, and requested none during the time the Family Service Plan was in force.

The same is true of the referral to the psychologist that Mother was required to see as part of the Family Service Plan. Green testified that Mother completed her psychological evaluation before T.R.H. was removed. Green then testified that she "referred her back to that same psychologist for subsequent services," but that

15

Mother did not go because she said "she didn't know how to get there." Given Green's testimony that the Department was seeking termination because Mother failed to complete her Family Service Plan and that Mother in fact did not complete *any* services except the psychological assessment (coupled with the lack of any evidence that Mother *did* complete any of her service tasks), we hold that the trial court could have determined, by sufficient clear and convincing evidence, that termination was warranted under § 161.001(b)(1)(O).

We thus overrule Mother's third issue. Because a single ground under section 161.001(b)(1) is sufficient to support termination if there is also sufficient evidence that termination is in the child's best interest, we need not address Mother's first and second issues challenges the sufficiency of the evidence to support termination under §161.001(b)(1)(N) or §161.001(b)(1)(E). *A.V.*, 113 S.W.3d at 362.

### B. Sufficiency of the Evidence that Termination was in T.R.H.'s Best Interest

As a matter of public policy, "the best interest of a child is usually served by maintaining the parent-child relationship." *J.F.C.*, 96 S.W.3d at 294. Despite this important relationship, the Texas Supreme Court has held that "protection of the child is paramount." *A.V.*, 113 S.W.3d at 361.

Appellate courts examine the entire record to decide what is in the best interest of the child. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013).

Courts weigh: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist the individual in promoting the child's best interest; (6) the plans for the child by individual or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The Department need not prove every factor as a condition precedent to parental termination. *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Furthermore, lack of evidence about some factors does not preclude a factfinder from reasonably concluding that termination is in the child's best interest. *Id.*

Because the Department is the petitioner here, we begin with the statutory mandate that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest," TEX. FAM. CODE ANN. § 263.307(a), whether that be with the parents or other permanent caregivers.

Mother argues that the evidence does not contain enough specific details about T.R.H.'s foster parent to amount to clear and convincing evidence that termination was in T.R.H.'s best interest. We disagree.

17

Green's testimony and the exhibits presented at trial demonstrated that, while Mother loved her children, she was lacking in skills to care for T.R.H. She had never been employed and had a history of leaving her children with various random caregivers, one of which murdered her older child. She did not demonstrate appropriate parenting in physically taking care of T.R.H. She admitted to smoking marihuana frequently. Most importantly, even after being offered numerous services to help to her gain the stability and skills to reunite with T.R.H. (the Department's original goal), she made no effort to avail herself of any of those services or benefits. And she demonstrated an indifference to maintaining a strong relationship with him, as she chose to only visit him once every other month, despite being permitted more frequent visits. She did not show up the trial to determine whether her parental rights would be terminated.

In contrast, Green testified that T.R.H. has been in a foster home for a year that she characterized as a "safe, stable environment." She opined that he is doing much better than he did when he was with Mother. His foster parent wishes to adopt T.R.H. and continue to provide him a permanent and stable home. Although Mother argues that the Department should have offered more specific evidence about the foster parent's job, home, and living situation, we disagree that the lack of those details rendered it inappropriate for the trial court to make a determination that termination was in T.R.H.'s best interest. Contrasting the Department's

positive assessment of the suitability and stability of T.R.H.'s current placement with Mother's lack of planning, action, or history of appropriate parenting, the trial court had clear and convincing evidence to support its determination that termination of Mother's parental rights was in T.R.H.'s best interest.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Bland.