

# NUMBER 13-18-00114-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF I.G. JR. AND O.I.G., CHILDREN

**On appeal from the 36th District Court
of San Patricio County, Texas.**

## MEMORANDUM OPINION

**Before Justices Rodriguez, Contreras, and Hinojosa
Memorandum Opinion by Justice Rodriguez**

The trial court terminated the parental rights of Mother and Father to their sons I.G. Jr. and O.I.G.[1]  Only Father appeals.   By three issues, Father asserts that the evidence is insufficient to support the termination and that he was deprived of his right to counsel. We reverse and render.

---

[1] To protect the identities of the minors, we refer to those involved in the case by aliases, as necessary.  *See* TEX. R. APP. P. 9.8(b).

## I.    BACKGROUND

On February 8, 2017, a petition to terminate Mother and Father's parental rights was filed by the Texas Department of Family and Protective Services (the Department). A one-day bench trial was held on February 14, 2018.

At the time of trial, Mother and Father had been separated for at least three years. Their sons were eight and ten years old, respectively, and they had lived with Father. However, when state authorities began investigating Father's conduct as a parent, he voluntarily placed the boys with his own mother and her husband (the Grandparents).

Cassandra Teran testified about her work as an investigator for Child Protective Services (CPS). Teran explained that CPS began investigating Father shortly after state agencies received a report that Father was using crystal methamphetamine, that his home was dirty and filled with trash, and that he was verbally abusing his children and his significant other. Later, CPS learned of allegations that Father had physically abused Mother.

Teran's interview with the boys revealed only that the children loved Father and wished to remain with him, and they had never seen him abuse Mother. However, Teran testified that when she confronted Father, he confessed to using methamphetamine.

Teran testified that, during the pendency of the investigation, Father was arrested for running over his significant other with a vehicle. Father eventually pleaded guilty to aggravated assault with a deadly weapon, and he was sentenced to eight years' confinement. Teran testified that the Department filed its petition to terminate Mother and Father's parental rights after the arrest. At a hearing on the Department's petition,

Father agreed with the Grandparents and the Department that the Grandparents should be named temporary managing conservators of the boys.

Teran and Jenna Edgehill, a conservatorship worker with the Department, also testified about their investigation of Mother and Father's relationship. According to Teran, Mother explained that she had ceded custody to Father because she believed him to be a better caretaker. However, according to Edgehill, Mother explained that she relinquished custody of the children to Father only because Father threatened to kill her if she did not do so. Mother reported that Father had abused her for roughly ten years, leading to multiple arrests for domestic abuse, but no convictions. Edgehill explained that she believed Mother's accusations, even though Mother had a history of drug abuse and giving false reports. Ultimately, Edgehill recommended the termination of Father's parental rights.

According to Edgehill and Teran, the Department's plan for the children was to place them with the Grandparents, who would eventually adopt them after Father's rights were terminated. Edgehill agreed that the Grandparents were honest people who would protect the boys and provide them with a good home, and both Edgehill and Teran agreed that it was in the children's best interest to live with the Grandparents.

For his part, Father wished to retain his parental rights and have the Grandparents named managing conservators during his prison sentence. Father denied abusing Mother, denied that the woman he ran over was his significant other, and testified that running her over was an accident. Father agreed that he had made mistakes, but testified that he believed he could be rehabilitated and paroled from prison as a better

3

man in four years' time. He believed that despite his mistakes, he had raised the boys well and wanted to remain their father. He described Grandmother as an excellent caretaker.

Finally, the trial court heard the testimony of Grandmother. Grandmother testified that prior to CPS's involvement, the boys were happy and healthy, and Father brought the boys to her house almost every day. While Father worked, Grandmother would help them with homework, and Father would pick them up later and put them to bed. Grandmother testified that she wished for Father to retain his parental rights, and she believed it to be in the boys' best interest to remain under her care for the foreseeable future.

At the conclusion of the evidence, the trial court ordered the termination of Father's parental rights. The trial court found that termination was warranted because (1) Father would be imprisoned and unable to care for the children for two years or more and (2) termination was in the boys' best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(Q), (b)(2) (West, Westlaw through 2017 1st C.S.). The trial court further found that the appointment of a parent as managing conservator would not be in the best interest of the children because the appointment would significantly impair the children's physical health or emotional development. *See id.* § 153.131(a) (West, Westlaw through 2017 1st C.S.). Instead, the trial court appointed the Department as permanent managing conservator, finding that such an appointment was in the children's best interest. *See id.* § 153.005 (West, Westlaw through 2017 1st C.S.). This appeal followed.

4

## II. ABILITY TO CARE FOR THE CHILDREN

By what we deem his first issue, Father challenges the sufficiency of the evidence to support the trial court's finding that his incarceration would leave him unable to care for his children for at least two years. He asserts that he arranged for the Grandparents to care for the boys, and he was therefore caring for the boys vicariously. He contends that this vicarious support should preclude a finding under subsection Q of the family code.

### A. Standard of Review

Because involuntary termination involves fundamental constitutional rights, evidence justifying termination generally must be clear and convincing. *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2017 1st C.S.); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

In a legal sufficiency review under the clear and convincing standard, we look at all the evidence in the light most favorable to the trial court's finding, assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *In re J.F.C.*, 96 S.W.3d at 266. If, in that light, we determine that no reasonable factfinder could form a firm belief or conviction that the finding is true, we must conclude that the evidence is legally insufficient. *Id.*

### B. Applicable Law

The involuntary-termination statute provides two prerequisites for termination: first, the proponent must establish one or more of the recognized grounds for termination, and, second, termination must be in the child's best interest. *In re S.M.R.*, 434 S.W.3d at 580. One recognized ground for termination occurs where a parent has knowingly engaged in criminal conduct that has resulted in the parent's conviction of an offense, confinement, and inability to care for the child for not less than two years from the date of filing the petition. TEX. FAM. CODE ANN. § 161.001(b)(1)(Q). The purpose of subsection Q is to protect children from neglect. *See In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003); *see also In re K.G.*, No. 11-12-00130-CV, 2012 WL 3765058, at *3 (Tex. App.—Eastland Aug. 31, 2012, no pet.) (mem. op.).

Incarceration alone does not show inability to care for a child. *In re Caballero*, 53 S.W.3d 391, 395 (Tex. App.—Amarillo 2001, pet. denied). Otherwise, the termination of parental rights could become an additional punishment automatically imposed along with imprisonment for almost any crime. *In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.).

We employ a burden-shifting analysis to assess an incarcerated parent's ability to care for a child. *In re Caballero*, 53 S.W.3d at 396; *see also In re S.R.*, No. 13-15-00114-CV, 2015 WL 3657747, at *2 (Tex. App.—Corpus Christi June 11, 2015, no pet.) (mem. op.) (adopting *Caballero's* analysis of the burden of proof under subsection Q). The party seeking termination must first establish that the parent will remain in confinement for the requisite period. *In re Caballero*, 53 S.W.3d at 396. The burden then shifts to the parent to produce "some evidence" as to how he would provide or arrange to provide

care for the child during his incarceration. *Id.* "Cases discussing the incarcerated parent's provision of support through other people contemplate that the support will come from the incarcerated parent's family or someone who has agreed to assume the incarcerated parent's obligation to care for the child." *In re H.R.M.*, 209 S.W.3d 105, 110 (Tex. 2006) (per curiam); *see also In re S.R.*, 2015 WL 3657747, at *2.

If the parent meets that burden of production, the Department then has the burden of persuasion to show by clear and convincing evidence that the parent's provision or arrangement would not satisfy the parent's duty to the child. *In re Caballero*, 53 S.W.3d at 396. In other words, the Department must then persuade the trial court that the stated arrangements would not meet the parent's obligation to care for the child. *Id.*

## C.    Analysis

Father challenges the finding that he would be unable to provide support. Father concedes that the Department met its initial burden to show that he will be incarcerated for the requisite period. *See id.* However, Father argues that he carried his burden to produce some evidence that his family members—the Grandparents—agreed to support and care for the children on his behalf over the next several years. The Department asserts that there is no evidence that the family members have agreed to take care of the children on Father's behalf. We agree with Father.

There was testimony that Father went to some lengths to balance a busy work schedule and to ensure that the children's needs were met and that the Grandparents cared for the boys on his behalf while Father worked. Grandmother testified that she helped Father with the boys almost every day:

7

Q. [B]efore C.P.S. became actively involved, were those boys happy and healthy children?

A. Yes, sir.

Q. Physically, they were in good shape?

A. Yes, sir.

Q. They did fine in school?

A. Yes.

Q. What was your interaction with those boys? How often did you see them?

A. Mostly every day.

Q. Most every day?

A. He would bring them to my house every day to help them with his homework and he would pick them up and they would go home to bathe and to go to sleep. And then on weekends when he would work, they would come to my house Saturdays and Sundays. *I was helping him with the boys.*

(Emphasis added). According to Grandmother, she cared for the boys as part of her "working relationship" with Father in "raising these boys." Grandmother viewed her role as Father's "support network." When the Department began to investigate Father, he voluntarily placed the boys with the Grandparents. At the hearing on the Department's petition for termination, Father requested that the Grandparents be named temporary managing conservators of the boys while he was incarcerated, and the Grandparents joined Father's request. *See In re E.S.S.*, 131 S.W.3d at 640 (finding that an appellant father met his burden by producing some evidence of an agreement "naming Appellant's mother and brother possessory conservators"). At trial, Father expressed his desire to continue the Grandparents' conservatorship, and Grandmother arguably endorsed this

8

plan and expressed her desire for Father to retain his parental rights. Accordingly, Father met his burden to produce "some evidence" as to how he would arrange to provide care for the children during his incarceration: the Grandparents would care for the boys on his behalf. *See In re Caballero*, 53 S.W.3d at 396.

The burden shifted to the Department to show by clear and convincing evidence that Father's arrangement would not satisfy the parent's duty to the children. *See id.* However, rather than challenging Father's proposal, the Department advocated for the very same placement. The Department's witness Edgehill offered similar testimony to Father when she described the Grandparents as responsible, honest people who would provide the boys with a good home. Finally, all witnesses, including Edgehill and Teran, agreed that it was in the children's best interest to remain in the Grandparents' home. If the purpose of subsection Q is to protect children from neglect, the Department's own evidence effectively established that the children would face no risk of neglect under the Grandparents' supervision. *See In re A.V.*, 113 S.W.3d at 360. Even viewing the record in the light most favorable to the trial court's judgment, no reasonable factfinder could form a firm belief or conviction that Father's proposed arrangement would not satisfy his obligation to care for the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q); *In re J.F.C.*, 96 S.W.3d at 266. We must conclude that the evidence is legally insufficient to support the trial court's finding. *See In re J.F.C.*, 96 S.W.3d at 266.

We sustain Father's first issue, which renders it unnecessary to consider his remaining issues. *See* Tex. R. App. P. 47.1.

9

**D.      Conservatorship**

In his brief, Father prays for this court to reverse the trial court's order terminating his parental rights and to remand the matter to the trial court for a determination of which party should be named conservator:   the Grandparents or the Department.   However, Father did not separately challenge the appointment of the Department as the children's managing conservator.   This raises the question of whether we may reverse the order appointing the Department as a managing conservator.   We conclude that we may not.

If the trial court orders termination, section 161.207 provides a mechanism to designate the Department as managing conservator of the child.   *See* TEX. FAM. CODE ANN. § 161.207(a) (West, Westlaw through 2017 1st C.S.); *In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam).   When that order of termination is reversed, section 161.207 will not support the Department's conservatorship.   *See In re D.N.C.*, 252 S.W.3d at 319.   The question then becomes whether (1) the Department has pleaded alternative grounds for appointment as conservator and (2) the trial court has entered findings supporting appointment under those alternative grounds.   *See id.*; *In re J.A.J.*, 243 S.W.3d 611, 615 (Tex. 2007).   If there are no findings on alternative grounds, then reversal of the Department's appointment is required.   *See In re D.N.C.*, 252 S.W.3d at 319.   However, if there are findings supporting the Department's appointment on alternative grounds, then the reversal of a termination judgment does not affect the trial court's conservatorship appointment; rather the parent must separately challenge the conservatorship to prevail.   *See In re J.A.J.*, 243 S.W.3d at 615; *see also In re I.B.*, No. 13-17-00098-CV, 2017 WL 2806779, at *11 (Tex. App.—Corpus Christi June 29, 2017,

no pet.) (mem. op.).

Here, the Department pleaded alternative grounds for appointment as the boys' managing conservator. *See* TEX. FAM. CODE ANN. §§ 153.002, 153.005(a)–(b), 153.131(a) (West, Westlaw through 2017 1st C.S.). Pursuant to those grounds, the trial court entered the necessary findings that appointment of a parent as the boys' managing conservator would not be in their best interest because it would significantly impair their physical health or emotional development, *see id.* § 153.131(a), and that appointment of the Department was in the boys' best interest. *See id.* § 153.002. In light of these findings, Father was required to separately challenge the appointment in order to obtain reversal of the Department's conservatorship. *See In re D.N.C.*, 252 S.W.3d at 319. Because he did not, we may not disturb the trial court's order appointing the Department as the boys' managing conservator. *See id.*

### III. CONCLUSION

We reverse the trial court's judgment terminating Father's parental rights to I.G. Jr. and O.I.G. and render judgment denying the Department's petition for termination.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
21st day of June, 2018.