**Opinion issued June 11, 2026**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

**NO. 01-25-01074-CV**

—————————————

**IN THE INTEREST OF A.A., A CHILD**

———————————————————————————————

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-02614J**

———————————————————————————————

**DISSENTING MEMORANDUM OPINION**

I agree the evidence is legally and factually sufficient to support the trial court's findings Mother committed predicate acts for termination of her parental rights and legally sufficient to support the court's finding termination of Mother's parental rights is in A.A.'s best interest. *See* TEX. FAM. CODE § 161.001(b). Because

I would hold the evidence is also factually sufficient to support the best-interest finding, I respectfully dissent.

## I.     Sufficiency Review in Termination Appeals

Under the heightened standard of review in termination cases, the distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). In a legal-sufficiency review, we cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* at 630–31. In a factual-sufficiency review, we weigh disputed evidence contrary to the finding against all the evidence favoring the finding to determine whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* at 631. Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

## II.     The Evidence

There is some undisputed evidence contrary to the trial court's best-interest finding, such as Mother's fifteen clean drug and alcohol tests, her consistent visits with A.A., and her strong start completing items on her family services plan. I agree with the Majority that these undisputed facts are not so weighty compared to all the

2

evidence supporting the best-interest finding that the trial court could not form a firm belief or conviction that the finding was true—the evidence is legally sufficient.

Turning to factual sufficiency, I do not believe there is such significant disputed evidence the trial court could not have credited in favor of its best-interest finding, compared to all the evidence supporting the finding, that the court could not have formed a firm belief or conviction that the finding was true.

## A.    Mother's history before A.A. was removed

Mother's parental rights to her other five children previously were terminated on endangerment grounds. Her "CPS History" reflects: (1) in 2014, Mother admitted possibly being under the influence of marijuana and losing control, becoming verbally and physically aggressive while watching her child; family told the Department that Mother unpredictably and "instantly changes her character to being aggressive"; (2) in 2016, Mother took "a high dose of Ibuprofen" while suffering from post-partum depression and received inpatient treatment at a behavioral hospital for three days; (3) in 2017, two of Mother's children wandered from their home and were brought back by police; (4) in 2018, the Department learned there had been multiple calls to police for physical and verbal disputes between Mother and her partner, and Mother was not on her "mental health treatment, had suicidal thoughts, and was in a psychiatric hospital"; (5) in 2020, police went to Mother's home twice because she and her partner engaged in family violence when the

3

children were home; four children were removed from Mother's home and their belongings were found to contain marijuana; and (6) also in 2020, Mother gave birth to a child who tested positive for amphetamines, and Mother tested positive for methamphetamines.[1]

After giving birth to A.A. in June 2024, Mother's lack of care caused A.A. to be so developmentally delayed that, at five-months old, she could not hold her head up and was like a one-week-old newborn.

## B.      Mother's inconsistency taking medications

In October 2024, Mother and her boyfriend were "drunk" at home with A.A. when Mother attacked the boyfriend as he tried to leave, scratching him on the face and attempting to "cut his throat with a bus card."  The boyfriend then broke Mother's nose, and she went with A.A. to the hospital.  There, Mother disclosed that she had a history of bipolar disorder and depression and made statements regarding suicide, specifically that she had wanted to or attempted to overdose on Tylenol that morning.[2]  Mother was admitted for inpatient treatment at a psychiatric hospital for

---

[1]     The Department determined there was "Reason to Believe" Mother engaged in neglectful supervision for the 2014, 2018, and 2020 incidents, and "Ruled Out" neglectful supervision for the 2016 and 2017 incidents.  For the 2016 through 2020 incidents, Mother was living with a partner who may be father to one or more of the children.  At some point, Mother and this partner broke up.

[2]     At the time the Department became involved with A.A., Mother's own mother told the Department that Mother starts having suicidal thoughts when she drinks and gets depressed.

one week.  This left A.A. without anyone to care for her, and the Department took custody of her.

Even though Mother's mental-health conditions led to A.A. being removed, Mother did not consistently take her mental-health medications during this case.  In July 2025, a caseworker observed a full bottle of Mother's medication from June 3, 2025, and the pharmacy told the caseworker the medication had not been refilled.  The caseworker testified that in July, August, and September, Mother was not taking the medication.  Mother obtained new medication in early October 2025, the month of trial.  The guardian ad litem stated she "obtained information suggesting that [M]other has not continued to take her anti-depressants."  The Department supervisor on this case testified Mother's inconsistency in taking her medications is a "major concern" because A.A. was removed due to Mother's mental instability and violence.

Mother admitted she did not resume taking her mental-health medications after A.A.'s birth, even though she needed the medications.  Mother stated she asked for mental-health services, but no one got back with her.  Mother testified she stopped taking medications as of the August 2025 permanency hearing because she had become confused and thought she had enough medications.  Later, Mother said she quit taking them because she thought the dosage was too high and making it difficult for her to "show up to work."  Mother stated she decided to quit taking the

medication after a psychiatrist declined her request for a reduced dosage. Mother testified that, at her October 2025 appointment, the psychiatrist lowered the dosage, which seems to be working. Mother further stated she could not get an earlier appointment because of Medicaid issues. Mother expressed that it is "really important" for her to take the medication every day to be "well for [her] daughter."[3]

## C.   Mother's delay beginning Alcoholics Anonymous meetings

Mother was required to attend AA meetings during this case but admitted she did not begin doing so until August 2025, only a couple of months before trial. Mother's attendance sheet, which she presented at trial, shows she attended AA meetings in August, September, and October 2025. Mother said she did not start the AA meetings sooner because she was trying to "cope with everything going on" and find employment, but she conceded she lacks "a valid excuse." The Department initially reported Mother was attending the required AA meetings, which based on Mother's trial testimony, supports an inference she lied to the Department during initial reporting about her attendance.

---

[3]   There is little to no direct evidence regarding what Mother's medications were specifically supposed to do for her and what the specific results would be of her not taking them. But the evidence supports that Mother has a long history of mental illness, including depression and hospitalizations, that the medications are anti-depressants, and Mother agrees she needs to take the medications daily in order to care for A.A. Thus, even without knowing more specifics about the medications, the trial court could have reasonably found Mother cannot provide adequate care for A.A. unless Mother consistently takes her medications.

**D.    Mother's unstable living arrangements**

After their violent fight in October 2024 that resulted in the boyfriend breaking Mother's nose, Mother resumed living with the boyfriend. Mother lied to the Department about her name being on the lease—the lease was in her boyfriend's name only. When questioned about this, Mother said it does not matter because she and the boyfriend would not separate. However, by the August 2025 permanency hearing, they had gotten into another dispute, and Mother "was put out of the home."

Thereafter, Mother obtained a three-month lease and started living with a man with a history of drug use. This man was not on the lease. The guardian ad litem found it "very" concerning Mother would live with someone with a drug history given her own drug history. Mother concedes living with this man is a concern for A.A., but said the man told her that he no longer uses drugs. The Department supervisor testified that Mother's three-month lease does not show stability, and the landlord of that lease told the Department "the arrangement is temporary." Mother also prevented the caseworker from observing this home.

**E.    Mother's unstable employment**

In the single year this case was pending below, Mother had four different jobs. She was fired from one job, one was seasonal, she left one for a "better opportunity," and she had been working at a market-research call center for three months at the time of trial, purportedly making enough money to support A.A.

### III. The Evidence Is Factually Sufficient

Considering all the facts—including disputed facts that cannot be credited in favor of the trial court's best-interest finding, if there are any—the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights is in A.A.'s best interest. *See In re A.C.*, 560 S.W.3d at 631.

During this case, when her parental rights were on the line and the Department was working with her to achieve reunification, Mother did not consistently take mental-health medications she acknowledged were necessary for her to care for A.A. (and, in fact, unilaterally quit them when the psychiatrist declined to lower the dosage), grossly delayed attending AA meetings, chose home environments that exposed her to domestic violence and people with a history of drug use despite her own history of drug use, and failed to establish stable employment. Despite undisputed evidence of Mother's clean drug and alcohol tests, good visits with A.A., and completion of much of the family services plan, her aforementioned failures coupled with her lengthy history of mental illness, drug and alcohol abuse, and neglect of children (which includes her "CPS history" and five months caring for A.A. that resulted in A.A. being developmentally like a one-week-old), support a reasonable finding that Mother, even with assistance, is not likely to ever have the ability and stability to properly care for and provide a safe home for A.A. *See In re J.C.D.Y.*, No. 01-25-00640-CV, 2025 WL 4099753, at *17 (Tex. App.—Houston

[1st Dist.] Feb. 3, 2026, pet. denied) (mem. op.) ("A parent's past conduct is probative of his future conduct when evaluating the child's best interest."). Because the evidence supports a finding that Mother will never be able to meet A.A.'s needs but will continue to expose her to danger, the bulk of the *Holley* factors weighs in favor of termination being in A.A.'s best interest. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

Parental rights are accorded only to parents who are fit to accept the accompanying responsibilities. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). The evidence here is factually sufficient to support the trial court's finding that Mother is not fit to accept these responsibilities and that termination of her parental rights is in A.A.'s best interest so that A.A. can find a permanent, stable home. *See In re K.S.L.*, 538 S.W.3d 107, 115 (Tex. 2017) ("The child's best interest is inherently threatened by undue uncertainty and delay in finally determining where the child will live and who will raise her."). Accordingly, I respectfully dissent.

Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Justice Johnson, dissenting.